**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**

BRANDON HUYLER, on behalf of himself and all others similarly situated,

*Plaintiff,*

v.

CAL-MAINE FOODS, INC.; ROSE ACRE FARMS, INC.; DAYBREAK FOODS, INC.; HILLANDALE FARMS CORPORATION; HILLANDALE FARMS OF PA., INC.; HILLANDALE-GETTYSBURG, LLC; HILLANDALE FARMS EAST, INC.; HILLANDALE FARMS CONN, LLC; HILLANDALE FARMS, INC.; HILLANDALE FARMS OF DELAWARE, INC.; VERSOVA HOLDINGS, LLC; URNER BARRY PUBLICATIONS, INC. d/b/a EXPANA; EGG CLEARINGHOUSE, INC.; and DOES 1-10,

*Defendants.*

Case No.: 1:26-cv-00135

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1
II. JURISDICTION AND VENUE....................................................................................4
III. PARTIES ..................................................................................................................5
A. PLAINTIFF.......................................................................................................5
B. DEFENDANTS ..................................................................................................6
C. AGENTS AND CO-CONSPIRATORS ...................................................................11
IV. FACTUAL ALLEGATIONS ....................................................................................13
A. Background on the United States Egg Industry ...................................................13
B. Concentration, Consolidation, and Integration in the United States Egg Industry .......................................................................................................16
C. Egg Pricing Is Unique.........................................................................................20
D. Defendants' Anticompetitive Conduct Caused Unprecedented Price Increases That Cannot Be Explained By Input Cost Increases Alone ..................24
E. Prior Actions & Investigations Relating to Defendants' Conduct.........................30
F. The Structure and Characteristics of the Conventional Eggs Market Render the Conspiracy Economically Plausible...............................................................35
G. Sharing Competitively Sensitive Information is a Plus Factor.............................41
V. CLASS ACTION ALLEGATIONS ............................................................................43
VI. DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS ..........47
VII. PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE, THE CLAIMS IN THIS LAWSUIT EARLIER...............................................................................................................48
VIII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY ..................49
IX. RELEVANT MARKET ...........................................................................................50
X. ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT.....................................51
XI. CLAIMS FOR RELIEF ...........................................................................................52
XII. PRAYER FOR RELIEF ..........................................................................................85
XIII. DEMAND FOR JURY TRIAL.................................................................................87

Plaintiff Brandon Huyler ("Plaintiff") brings this action on behalf of himself, and all others similarly situated to recover damages and obtain injunctive relief against Defendants Cal-Maine Foods, Inc., Rose Acre Farms, Inc., Daybreak Foods, Inc., Hillandale Farms Corporation, Hillandale Farms of PA., Inc., Hillandale-Gettysburg, LLC, Hillandale Farms East, Inc., Hillandale Farms Conn, LLC, Hillandale Farms, Inc., Hillandale Farms of Delaware, Inc., Versova Holdings, LLC, Urner Barry Publications, Inc. d/b/a Expana, Egg Clearinghouse, Inc., and DOES 1-10 (collectively, "Defendants") for violations of: (1) the antitrust laws of the United States; and (2) the antitrust and consumer protection laws of the states set forth herein. Plaintiff alleges as follows based on personal knowledge as to himself, and on information and belief as to all others.

## I. INTRODUCTION

1. From at least January 1, 2022 until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period"), Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize the price of conventional fresh shell eggs (referred to in this Complaint as "Conventional Eggs," "Shell Eggs" or "eggs") sold in the United States.

2. Most of the eggs sold in the United States are Conventional Eggs. For example, in 2024, nearly 70% of all the eggs produced were sold as Conventional Eggs and around 29% were processed into further egg products.

3. The Conventional Eggs industry in the United States is highly concentrated, making it ripe for collusion. In fact, just five companies own roughly half of all egg-laying commercial hens: Defendants Cal-Maine, Rose Acre, Versova, Hillandale, and Daybreak (collectively referred to as "Egg Producing Defendants").

4. Defendants implemented and executed their conspiracy by collectively increasing the price of Conventional Eggs including manipulation of an industry-wide pricing benchmark,

exchange of competitively sensitive pricing information, leverage of a slight supply disruption and a temporary spike in input costs to justify outsized, and utilization of other available means to exploit their collective market power and artificially increase prices of Conventional Eggs.

5. During the Class Period, instead of competing on price, the Egg Producing Defendants collaborated and were careful to ensure that any price increases were matched by their ostensible competitors.

6. The Egg Producing Defendants have leveraged their strong market position to manipulate the industry-wide pricing benchmark, Urner Barry, combined with exchanges of competitively sensitive information to align the pricing of Conventional Eggs at higher rates. This strategy proved highly effective due to the small number of companies involved and the methodical coordination in their actions, which enabled them to successfully implement and enforce price hikes.

7. The Egg Producing Defendants' coordinated activities were facilitated by Defendant Urner Barry; a publishing firm specializing in the collection, analysis, and distribution of comprehensive and up-to-date data for clients within the egg industry. More specifically, Urner Barry publishes what is ubiquitously referred to as the egg industry's benchmark pricing index.

8. Egg Producing Defendants, as part of their illegal arrangement, gave Defendant Urner Barry inflated reports about egg price "assessments." Urner Barry would then publish price quotes based on these subjective reports from its subscribers, which included the Egg Producing Defendants. The company also factored in transaction prices from Defendant Egg Clearinghouse, Inc. ("ECI") an exclusive online spot market for eggs available only to members.

9. Because there were very few transactions on the Egg Clearinghouse, and the Egg Producing Defendants handled large volumes, they could easily influence both the volume and

pricing on the platform. These figures were then used in Urner Barry's published price quotes, which became the benchmark for the Egg Producing Defendants' sales of Conventional Eggs. This process allowed Urner Barry and ECI to emphasize price fluctuations triggered by major producers, making it difficult for independent parties to compete.

10. Under this pricing scheme, whenever the Urner Barry egg price index increased, the prices in contracts with egg buyers would also rise. If several major players in the industry acted together, this could set off a cycle of continually escalating prices. In short, manipulating Urner Barry's price quotes through the Egg Clearinghouse's spot market, allowed Egg Producing Defendants to consistently raise and artificially inflate prices for their products.

11. Defendants have consistently attributed increased prices during the Class Period to the occurrence of Highly Pathogenic Avian Influenza H5N1 ("HPAI"), which resulted in the culling of millions of layer hens starting in late 2021. However, the effect of HPAI does not fully explain the significant rise in egg prices observed during the Class Period. Instead, the Egg Producer Defendants appear to have cited HPAI as justification for substantially raising egg prices, adversely affecting Plaintiff and the Classes (as defined herein).

12. Similarly, input costs do not account for the trend in egg prices observed during the Class Period. Rather, economic data suggest that major inputs required for egg production declined, even as egg prices continued to rise.

13. Numerous additional "plus factors" also existed within the egg market during the Class Period, including but not limited to the following: (1) opportunities to collude; (2) price increases that cannot be explained by higher input costs; (3) price increases contrary to Egg Producing Defendants' individual self-interest; (4) the sharing of competitively sensitive information; and (5) multiple additional industry characteristics that facilitate collusion, such as

high barriers to entry and lack of substitutability in addition to the inelastic demand for a commodity product. Together, these "plus factors" enabled Defendants to successfully implement their conspiracy and maintain prices above competitive levels. And they further bolster the plausibility of Plaintiff's price-fixing scheme allegations.

14. Defendants' wrongful and anticompetitive actions had the intended purpose and effect of artificially fixing, raising, maintaining, and stabilizing the price of Conventional Eggs paid by Plaintiff and members of the Classes. As a direct result of Defendants' concerted pricing and supply side decision making, Conventional Egg prices in the United States have been artificially inflated since at least January 1, 2022, causing consumers, such as Plaintiff and members of the Classes, to pay more for Conventional Eggs than they would have but for Defendants' collusion.

15. On behalf of a proposed class of millions of consumers nationwide, Plaintiff bring this class action to put an end to Defendants' illegal scheme, to recover damages, and to restore competition in the Conventional Eggs marketplace.

## II. <u>JURISDICTION AND VENUE</u>

16. This action arises under Section 1 of the Sherman Act (15 U.S.C. § 1), and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26). Plaintiff's Sherman Act claim seeks injunctive relief, costs of suit, and reasonable attorneys' fees, and the state law claims seek injunctive relief, treble damages, costs of suit, and reasonable attorneys' fees.

17. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

18. This Court has personal jurisdiction over all Defendants pursuant to Section 12 of the Clayton Act, 15. U.S.C. § 22 and 28 U.S.C. § 1391.

19. Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed Class Members.

20. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

21. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (1) transacted business throughout the United States, including in this District; (2) manufactured, sold, shipped, and/or delivered substantial quantities of Conventional Eggs throughout the United States, including this District; (3) had substantial contacts with the United States, including this District; and/or (4) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

22. The activities of the Defendants and all co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

23. No other forum would be more convenient for the parties and witnesses to litigate this case.

## III. PARTIES

### A. PLAINTIFF

24. Plaintiff Brandon Huyler is a resident of Highland Park, Illinois, where Plaintiff

indirectly purchased Conventional Eggs sold by the Egg Producing Defendants during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

## B. DEFENDANTS

### 1. Cal-Maine

25. Defendant Cal-Maine Foods, Inc. ("Cal-Maine") is a publicly traded company incorporated in Delaware with headquarters in Ridgeland, Mississippi. Cal-Maine originated in 1957 as Adams Food. Twelve years later, it merged with Dairy Fresh Products and Maine Egg Farms. Over the next sixty years, Cal-Maine would acquire or otherwise integrate two dozen other businesses to become the largest egg producer in the United States. As of 2024, Cal-Maine controlled around 20% of the egg market. For fiscal year 2022 (June 2022-June 2023), Cal-Maine's reported gross profits of $1.2 billion.

26. Cal-Maine operates forty-nine egg production facilities across the United States, with locations in Alabama, Arkansas, Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Ohio, Oklahoma, South Carolina, Texas, and Utah.

27. Upon information and belief, Cal-Maine subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

28. At all times relevant to this action, Cal-Maine was doing business in the State of Indiana. Likewise, during the Class Period, Cal-Maine or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and produced and sold Conventional Eggs in interstate commerce in the United States and its territories, including in this District.

### 2. Rose Acre

29. Defendant Rose Acre Farms, Inc. ("Rose Acre") is a private company incorporated in Indiana with headquarters in Seymour, Indiana. Rose Acre is the second largest egg company in the United States, and it operates seventeen facilities across seven states, namely Indiana,

Illinois, Missouri, North Carolina, Georgia, Iowa and Arizona. Like Cal-Maine, Rose Acre's growth has been propelled by mergers, including its acquisitions of Agri-Foods, Inc. and National Egg Products, Inc. in the 1990s and the addition of five other facilities throughout the Midwest, Southeast and Southwest over the next two decades.

30. Upon information and belief, Rose Acre subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

31. At all times relevant to this action, Rose Acre was doing business in the State of Indiana. Likewise, During the Class Period, Rose Acre or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and produced and sold Conventional Eggs in interstate commerce in the United States and its territories, including in this District.

**3. <u>Daybreak Foods</u>**

32. Defendant Daybreak Foods, Inc. ("Daybreak") is a private business incorporated in Wisconsin with headquarters in Lake Mills, Wisconsin. Daybreak's farms are located in Wisconsin, Iowa, Minnesota, Michigan, Ohio and Illinois. It is the third largest egg producer in the United States.

33. Upon information and belief, Daybreak Foods subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

34. At all times relevant to this action, Daybreak Foods was conducting business in Indiana. Likewise, During the Class Period, Daybreak Foods or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and produced and sold Conventional Eggs in interstate commerce in the United States and its territories, including in this District.

**4. <u>Hillandale Farms</u>**

35. Defendant Hillandale Farms Corporation is a for-profit corporation organized under the law of Ohio. It is located in Akron, Ohio.

36. Defendant Hillandale Farms, Inc. is a corporation organized under the law of Ohio. It is located in Correy, Pennsylvania.

37. Defendant Hillandale Farms of PA., Inc. is a corporation organized under the law of Pennsylvania. It is located in Gettysburg, Pennsylvania.

38. Defendant Hillandale-Gettysburg, LLC is a limited liability company organized under the law of Pennsylvania. It is located in Gettysburg, Pennsylvania.

39. Defendant Hillandale Farms East, Inc. is a business corporation organized under the law of Pennsylvania. It is located in Reedsville, Pennsylvania.

40. Defendant Hillandale Farms Conn, LLC is a Connecticut limited liability company located in Bozrah, Connecticut.

41. Defendant Hillandale Farms of Delaware, Inc. is a corporation organized under the law of Delaware. Its registered agent is located in Hartly, Delaware.

42. The aforementioned Hillandale defendants are collectively referred to herein as "Hillandale" or "Hillandale Farms." Hillandale is a "vertically integrated supplier…directly involved in every aspect of egg production and distribution." Hillandale is an integrated enterprise producing and selling Shell Eggs throughout the United States. It operates several egg production facilities in Pennsylvania, Ohio, Iowa, Florida, Delaware and Connecticut. It is the fourth largest egg producer in the United States.

43. As of May 2025, Hillandale Farms was acquired by Luxembourg-based holding company Global Eggs. Global Eggs, founded last year and headquartered in Luxembourg, is operated by Brazil's Egg King Ricardo Faria. The company's portfolio includes Hillandale, Spanish egg producer Hevo, and Brazilian egg producer Granja Faria. Collectively, these businesses generated revenue exceeding $2 billion in 2024.

44. Upon information and belief, the Hillandale Farms family of companies subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

45. At all times relevant to this action, the Hillandale Farms family of companies was doing business in the State of Indiana. Likewise, During the Class Period, the Hillandale Farms family of companies or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and produced and sold Conventional Eggs in interstate commerce in the United States and its territories, including in this District.

**5. Versova**

46. Defendant Versova Holdings, LLC ("Versova") is a private company incorporated in Delaware and with headquarters in Sioux City, Iowa. It was formed in 2017 as a "holding company with a shared management team to manage the business functions of our farms." Versova is one of the largest egg producers in the United States and operates numerous farms in Iowa, Ohio, Washington and Oregon.

47. Upon information and belief, Versova subscribes to Urner Barry and its Conventional Egg prices are tied to Urner Barry's egg price index.

48. At all times relevant to this action, Versova was doing business in the State of Indiana. Likewise, During the Class Period, Versova or its predecessors, or affiliates, participated in the conspiracy alleged in this Complaint and produced and sold Conventional Eggs in interstate commerce in the United States and its territories, including in this District.

**6. Urner Barry**

49. Urner Barry Publications, Inc. doing business as Expana is a privately held corporation incorporated in New Jersey and maintaining its principal place of business in Toms River, New Jersey. For many years, Urner Barry has provided egg price publications to industry participants, including the Egg Producing Defendants.

50. Urner Barry, an industry consulting and data analytics firm, publishes retail Shell Egg price quotations that many egg producers use as the basis for their wholesale pricing. Urner Barry states that it offers clients—including Egg Producing Defendants—price assessments and market information that are timely, accurate, and unbiased.

51. Urner Barry's Comtell On-Line platform offers timely news, quotes, and research for the meat, poultry, egg, pork, veal, and seafood sectors. Its subscribers receive daily updates on key market conditions. Urner Barry also shares egg industry information through newsletters, directories, and wall charts.

52. Urner Barry collects data about genuine trades, as well as offers, bids, and other relevant market details by communicating directly with stakeholders throughout the egg industry's value chain, including the Egg Producing Defendants.

53. Based on this information, Urner Barry publishes a daily retail Shell Egg price quotation, claiming it accurately reflects the data they receive. The company also notes that, under normal circumstances, wholesale egg transactions typically occur below their published quotations; in practice, wholesale prices are usually the quoted figure minus a negotiated discount.

54. Urner Barry previously operated as a subsidiary of AgriBriefing Limited. In 2023, AgriBriefing Limited was acquired by the Mintec Group, a U.K.-based organization that, like Urner Barry, specializes in market intelligence and price data. In 2024, the Mintec Group unified its global operations under the single brand name Expana.

**7. <u>Egg Clearinghouse</u>**

55. Defendant Egg Clearinghouse, Inc. is a Delaware corporation with its offices and principal place of business in Dover, New Hampshire.

56. ECI was established by egg producers and purchasers as an alternative mechanism for pricing and trading eggs, differing from the larger exchanges traditionally located in New York

and Chicago.

57. ECI began brokering transactions in 1971 with a board comprising prominent industry leaders, including Fred Adams Jr., founder of Cal-Maine, the largest egg producer in the United States.

58. Throughout the Class Period, ECI functioned as an online spot market enabling participants to submit bids for eggs offered for sale and to view trade outcomes. Trading on the ECI marketplace is restricted exclusively to ECI members, which include both farmers and egg buyers.

59. During 2024, the ECI online platform facilitated the trade of 2.6 billion eggs and 39 million pounds of egg products, amounting to over $600 million in value.

60. Although ECI accounts for only 5% of the Shell Egg market, it has a significant impact on egg pricing across the country.

**8. <u>Doe Defendants</u>**

61. Doe Defendants 1 through 10 are sued herein under fictitious names because their true names and capacities, whether individual, corporate, associate, or otherwise, are presently unknown to Plaintiff. Plaintiff is informed and believes that each of the Doe Defendants are members of the conspiracy and may include, among other entities, other Conventional Egg producers who agreed to fix prices for Conventional Eggs and exchange confidential, proprietary, and competitively sensitive data among the Conventional Egg Producing Defendants via Defendant Urner Barry. Defendants are jointly and severally liable for the acts of Doe Defendants 1 through 10 whether or not Doe Defendants 1 through 10 are identified in this Complaint.

**C. AGENTS AND CO-CONSPIRATORS**

62. Defendants' acts were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or

transaction of Defendants' business affairs.

63. Each corporate Defendant, through its respective subsidiaries, affiliates, and agents, operated as a single unified entity.

64. Various other persons, firms and corporations not named as Defendants participated as co-conspirators with Defendants and performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-conspirators, whether or not the co-conspirators are named as Defendants in this Complaint.

65. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affair.

66. When Plaintiff mentions a corporate family in his allegations, Plaintiff is alleging that employees or agents from any entity within that corporate family participated in conspiratorial acts on behalf of all related Defendant companies within that corporate family. Since Defendants operate as corporate families, individuals often did not know each other's specific affiliations or distinctions between the various entities. Therefore, all Defendant entities within each corporate family were knowingly involved in the conspiracy to keep Conventional Egg prices above competitive levels.

67. Each Defendant named herein acted as the agent of or joint venturer with the other Defendants in carrying out the acts, violations and common course of conduct alleged herein.

68. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## IV. FACTUAL ALLEGATIONS

### A. Background on the United States Egg Industry

69. The American egg industry produces over 100 billion eggs annually.

70. Eggs are a staple in the American diet, valued for their nutritional content, including high-quality protein, vitamins, and essential nutrients. In 2024, the annual consumption of eggs in the United States was estimated at about 273 eggs per person.

71. Most egg consumption in the United States—approximately 78%—occurs as standalone items. This includes eggs prepared on their own, such as scrambled eggs, omelets, or eggs served in sandwiches. In fact, on any given day, nearly one in five adults consume eggs as an individual item or in omelets and nearly one in every ten consume an egg-containing sandwich.

72. About 19% of eggs are used as functional ingredients within a wide array of food products. These include bakery goods like cakes and cookies, bread items such as waffles and dumplings, sauces and condiments like Hollandaise sauce and mayonnaise, as well as coatings for meat and vegetables, including chicken nuggets, chicken tenders, and vegetable tempura. Eggs are also incorporated into mixed dishes, such as meat loaf and lasagna, where they contribute to structure, texture, and flavor.

73. As depicted in Figure 1 below, the egg industry produces eggs for human consumption, which are sold either as Shell Eggs for the retail and food service sectors or further processed into liquid or dried products for food manufacturers and foodservice distributors and establishments.

**FIGURE 1: UTILIZATION OF EGGS PRODUCED IN THE UNITED STATES**




74. Since it takes egg-laying hens to produce eggs, the supply chain for eggs is a subdivision of the broader poultry supply chain. Poultry production begins with primary breeders, the genetic stock for the industry. These primary breeder flocks include elite (also known as pedigree or foundation) birds, great-grandparent birds, and grandparent birds. Grandparent flocks produce the final generation of breeding birds, known as multiplier or parent flocks. Eggs from multiplier flocks hatch into production birds—broilers and egg-laying hens—raised for human consumption. Young egg-laying hens are raised on pullet farms until they reach egg-laying age, then transported to egg production farms.

75. Egg production is generally stable and not prone to sudden, uncontrollable fluctuations. Absent extraordinary disruptions, egg output can be accurately projected and managed with a high degree of precision. Such control enables producers to purposefully reduce output, delay the introduction of new flocks, or prematurely remove hens from production—steps that, when taken collectively, can artificially restrict supply and elevate prices. The predictability of the production cycle, combined with long planning horizons, gives rise to conditions that facilitate anticompetitive coordination.

76. The United States Department of Agriculture ("USDA") has implemented an extensive grading and sizing framework that standardizes Shell Eggs across the national market. USDA consumer grades—such as Grade AA, Grade A, and Grade B—are determined by defined interior and exterior quality criteria. Egg sizes are uniformly classified by weight per dozen, including Jumbo, Extra Large, Large, Medium, and Small. These government-mandated standards significantly limit meaningful product differentiation, rendering a "Grade A Large" egg from one egg producer effectively identical and fully substitutable for a "Grade A Large" egg from any other egg producer.

77. Egg production is broadly distributed throughout the United States, with significant levels of production in many states. The top five egg-producing states are Iowa, Ohio, Indiana, Pennsylvania and Texas. These five states produce about 45.4% of all United States eggs.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**FIGURE 2: EGG PRODUCTION BY STATE**




## B. Concentration, Consolidation, and Integration in the United States Egg Industry

78. As briefly discussed above, the American egg industry serves two principal end uses: (1) whole shell eggs sold primarily to retail consumers (the "shell egg" or "table egg" market), and (2) eggs that are broken and pasteurized, then sold in liquid or dried form mainly to restaurants, institutional buyers, and food manufacturers (the "breaker" market). Historically, approximately 70% of laying hens have supplied the Shell Egg market, with the remaining 30% supplying the breaker market. Within the Shell Egg segment, a smaller but expanding share consists of quality-differentiated products—such as cage-free or organic eggs—that typically command price premiums.

79. Currently, a small number of companies dominate United States all forms of egg

production, with Cal-Maine Foods at the forefront. With nearly 47 million egg-laying hens, Cal-Maine holds a little under 20% of the national egg market, substantially exceeding the scale of its nearest rival, as shown in Figure 3 below.

**FIGURE 3: TOP FIVE PRODUCERS: LAYER HEN RANKINGS**




80. As of 2020, the Egg Producing Defendants control 36-40% of all egg-laying hens in the United States. The top ten producers account for approximately 53% of the total, while the twenty largest collectively control just under 73%.

81. These figures are the result of rapid consolidation, driven primarily by mergers and acquisitions, within the industry over the past three decades. By 2000, the Watt Survey listed 63 companies with 1 million or more hens, and they represented 78% of the nation's total flock. At the same time, companies with 10+ million hens each controlled 27% of the nation's flock, and 11

companies with 5+ million hens controlled 41% of the nation's flock. This left only about 59 million (or approximately 21.5%) of the nation's 275 million hens in the hands of companies with less than 1 million hens each.

82. Cal-Maine first obtained its dominant position in the egg industry in 1988, when it tripled the number of egg-layers under its control from 6.5 million to 18.5 million by acquiring Cargill's egg production division. Since then, Cal-Maine has increased its dominant share of industry capacity and enhanced its vertical integration through at least 25 acquisitions of significant egg production and processing companies, with the most recent deal closing in September 2023.

83. The rise of the second-largest egg company, Rose Acre, has likewise been propelled by mergers, particularly its acquisitions of Agri-Foods, Inc., in 1992 and National Egg Products, Inc., in 1998.

84. Formed out of a roll-up of four large egg production companies in 2017, Versova Holdings has since acquired at least two others, including Rembrandt Foods and Willamette Egg Farms in 2021—the latter a 3-million-hen operation owned by Michael Foods, then the sixth-largest egg producer in the country. Although Daybreak Foods' history is more difficult to chart—the firm is a closely held private company—industry reports indicate it has made at least four sizable acquisitions in the past five years alone.

85. All in all, these acquisitions have enabled the Egg Producing Defendants to consolidate the industry horizontally while also expanding vertical control over both the upstream breeding and hatching of egg-laying hens and the downstream breaking and processing of eggs.

86. For example, in addition to its 40 million-plus hens and numerous egg production facilities, Cal-Maine hatches the majority of its chicks in its own multiplier farms and grows them

on its own pullet farms. When the hens reach egg-laying age, Cal-Maine transports them to its own production farms (~90%) or contracted farms (~10%), where they are given feed from Cal-Maine's own feed mills. Once eggs are produced, Cal-Maine conducts cleaning, grading, and packaging at its dedicated packing facilities for distribution as Shell Eggs. Alternatively, the company processes eggs into liquid, frozen, or dried forms at its processing plants, offering these as egg products. Cal-Maine then coordinates the delivery of table eggs and egg products by arranging customer pick-up, utilizing its own fleet, or partnering with contracted carriers to supply warehouses and retail locations.

87. Cal-Maine's vertical reach includes a breeder program of more than 10 million birds, giving it leverage over replacement stock essential to competitors without similar breeding capacity. In a January 2025 presentation to its investors, Cal-Maine touted that its "[f]ully integrated operations allow for scaled production and distribution capacity," reaching about 8.1 million eggs per hour.

88. Nearly all the other 20 largest egg companies also possess vertical capabilities in feed manufacturing and egg processing, resulting in very few independent egg packing and breaking operators available for non-integrated egg producers.

89. Only Defendants Cal-Maine and Rose Acre Farms have breeder flocks, however. The other egg producers instead must source all the pullets needed to replenish and expand their laying flocks from either Cal-Maine and Rose Acre Farms, on the one hand, or the highly concentrated layer-hen breeding industry in which two firms (Hendrix Genetics and EW Group) possess a duopoly, on the other.

90. Defendant Rose Acre also maintains its own breeder flock. Independent producers without breeder flocks must source replacement pullets either from Cal-Maine and Rose Acre or

from a two-firm genetics duopoly—Hendrix Genetics and EW Group—further narrowing their options.

91. More specifically, Hendrix Genetics and EW Group control the "parent flock," which produces the entire supply of pullets sold to downstream egg producers. This duopoly at the top of the supply chain acts as a structural bottleneck in the egg market, facilitating coordination among producers. The genetics firms, by independently pursuing their own profit-maximizing interests—such as limiting pullet supply to maintain high prices—effectively help sustain the downstream collusive arrangement. The duopoly poses a risk of input foreclosure by limiting other producers' ability to expand supply and deterring new entrants from competing away the supracompetitive egg prices.

92. Because of the breeders duopoly power (combined Hendrix and EW Group control about 90% of the world's egg-layer hens) egg producers in this country are unable to increase the size of their flocks or even replace hens that have aged out or died, without the involvement of this duopoly. Thus, Hendrix and EW Group are able to exert greater control over the market for layer chicks, giving them the ability to restrict the supply of layer hens, opening the door for potential collusion with the Egg Producing Defendants to maintain high egg prices.

## C. Egg Pricing is Unique

### 1. <u>Background on Egg Pricing, Urner Barry and ECI</u>

93. The U.S. egg industry historically saw stable prices. Throughout much of the 20th century, egg prices cycled mildly: population growth increased demand and prices, prompting producers to expand output, which then lowered prices. As supply stabilized, further population growth would again tighten supply, raise prices, and start the cycle anew. However, since major consolidation in the 1980s and 1990s, cyclical changes have become less common, and the industry now shows greater production rigidity regardless of price fluctuations.

94. The supply shocks of the COVID-19 Pandemic combined with the structural characteristics of the egg industry provided the perfect cover and opportunity for the Defendants to completely crack the egg supply and demand cycle and raise egg prices to anticompetitive, record levels.

95. In the United States, over 95% of eggs are sold through open-ended, non-exclusive contracts between producers and wholesale buyers. The pricing for these eggs is determined by daily wholesale quotes published online in Defendant Urner Barry's *Price-Current* publication. The remaining 5% of eggs are sold via cash transactions, with approximately 80% of those handled through auctions conducted by Defendant ECI.

96. In other words, unlike other commodities such as soy, corn, and orange juice, which have prices set openly on exchange markets, egg prices are primarily determined using reports and benchmark prices from Defendant Urner Barry enabled by data generated from spot sales facilitated and published by Defendant ECI.

97. ECI facilitates egg trading by allowing buyers to submit bids for truckloads of eggs at specified prices. Farmers with eggs to sell can then respond with their offers. For every dozen eggs traded, ECI collects a commission of one cent, regardless of the final transaction price.

98. Spot markets, like ECI, are where traders manage their long and short positions in commodities. Roughly 10% of trades determine the price for the other 90%, making the spot market price a key reference point. Producers and retailers use this price, published by Urner Barry, as a trusted basis for negotiations because it reflects the true market value.

99. Defendants and their co-conspirators were well aware that Urner Barry's pricing indices and its *Price-Current* publication, informed by information generated by ECI's spot market, served as the default benchmarking tool for egg prices across the United States.

### 2. Defendants Used Urner Barry and ECI to Implement the Conspiracy

100. Since nearly all eggs produced annually in the United States are sold via private contracts the data generated through the ECI facilitated sales is crucial for market analysis.

101. Karyn Rispoli, managing editor of Urner Barry's egg division has recognized that ECI offers a unique window into market activity that is typically unavailable due to the confidential nature of most egg contracts.

102. Similarly, Urner Barry gathers non-public information, including bids, offers, trades, inventory positions, market sentiment.

103. Urner Barry also collects pricing information discovered from the spot market and uses that information to establish market prices and then buyers and sellers use those prices to negotiate their contracts. This trade information consists of daily pricing data from producers, distributors, brokers, buyers including the Egg Producing Defendants, and Defendant ECI. This information gathering endeavor occurs daily and covers all manners of communication, including telephone, e-mail, text messaging.

104. An ordinary egg marketing contract uses formulas tied to Urner Barry quotes to set prices. These quotes reflect wholesale prices, which account for farm-level egg costs along with expenses for processing, packaging, and shipping, gathered from both public and private sources. Typically, egg deliveries made any day from Sunday to Saturday use the price from the previous Thursday's Urner Barry quote.

105. According to Defendant Cal-Maine's President and C.E.O. Sherman Miller, "the majority of our conventional eggs are sold based on market quotes published by Urner Barry, an independent, third-party market reporter."

106. Since nearly every commercial egg sale relies on Urner Barry's pricing, even small

changes in their daily quote can immediately affect the cost of billions of eggs throughout the market. This centralized system gave Defendants a strong motivation to impact the benchmark price.

107. Several recent lawsuits targeting major egg producers have focused on the problematic pricing practices common in the egg industry.

108. The issue, according to New York Attorney General Letitia James in a 2020 price gouging complaint filed against Defendant Hillandale, is that Urner Barry determines its quotes based on inputs provided by the same egg producers who then use these quotes to justify their pricing. This process creates a feedback loop that is inherently susceptible to manipulation.

109. This is troubling because, unlike other agricultural commodities such as soy, coffee, and sugar, the egg market does not operate through a regulated market exchange that facilitates open trading and price discovery. Instead, producers typically rely on daily price quotes from Urner Barry as a reference point when negotiating contract prices with buyers.

110. Although the wholesale price of eggs is linked to the Urner Barry index, the largest egg producers retain the capacity to input data into the index, influencing pricing in an anticompetitive manner advantageous to the industry.

111. In other words, because Urner Barry's pricing relies significantly on self-reported transaction data from major industry participants, it is inherently vulnerable to manipulation. By submitting higher prices, the Egg Producing Defendants can influence Urner Barry's benchmark upward, with the understanding that this increased price will be automatically incorporated into future contract deliveries.

112. Tying sales contract prices to quotes from Urner Barry, which uses information gathering and sharing in addition to ECI spot sales data to develop its benchmarking numbers,

limits competition as it allows large producers to influence prices while restricting "independent, competitive" pricing decisions.

### D. Defendants' Anticompetitive Conduct Caused Unprecedented Price Increases That Cannot Be Explained By Input Cost Increases Alone

113. Between 2022 and 2025, egg prices in the United States reached record levels. The average cost for a dozen Grade A large eggs rose dramatically—from roughly $1.79 in December 2021 to approximately $4.25 by December 2022, an increase of nearly 140% in just one year. Egg prices peaked again at $4.82 in January 2025 and then surged to a new all-time high of $6.23 in March 2025.

114. These price spikes were much higher than what history would suggest, rising well above typical food inflation rates. According to the Bureau of Labor Statistics ("BLS"), the unadjusted Consumer Price Index ("CPI") for all items for urban consumers increased by 0.5% in January 2025, resulting in annual CPI inflation of 3%. At the same time, the unadjusted 12-month CPI for eggs rose by 53% from January 2024 to January 2025, contributing significantly to overall inflation.

115. In 2021, prior to the start of the Class Period, egg prices were stable, in the $1.50–$1.80 range per dozen. In December 2021, the price for a dozen eggs was approximately $1.79, which was in line with historical norms (the prior record high was ~ $2.97 in Sept 2015 during an earlier avian flu outbreak).

116. Egg prices began rising in early 2022. In April 2022, the national average price for a dozen eggs had reached $2.52 per dozen, with prices between June and August 2022 ranging from $2.70 to $3.12. The initial peak occurred in December 2022, when the average rose to $4.25 per dozen—an approximate 138% increase compared to the previous year (December 2021 to December 2022). This marked a new historical high, surpassing previous records set during the

2015 avian influenza outbreak.

117. In January 2023, prices briefly peaked at $4.82, establishing a new record high. Following the winter holiday period, prices experienced a significant decline throughout mid-2023. By June and July 2023, the average price decreased to approximately $2.09, nearing pre-Class Period levels. The recovery in supply—supported by the absence of major avian flu outbreaks in early 2023—contributed to price stabilization and an approximate 55% decrease from the January peak.

118. Egg prices remained stable for most of 2023, averaging in the low $2 range toward the end of that year. However, in mid-2024, prices began to increase; and by September 2024, the average price had risen to approximately $3.83. This upward trend continued through the end of the year, with December 2024 prices averaging $4.16, nearly reaching the peak levels recorded in 2022.

119. The elevated pricing trend persisted into the beginning of the year. In January 2025, the cost of a dozen eggs reached approximately $4.95, marking a new record for that month. The highest price occurred in March 2025, when the average rose to $6.23 per dozen—more than triple the pre-Class Period norm. This figure represents the highest nominal egg price on record and, even after accounting for inflation, remains unmatched. In certain regions, consumers paid significantly above this national average. Following the peak in March, prices began to decline, with the national average decreasing to around $2.87 by November 2025.

**FIGURE 4: Shell Eggs: Monthly USDA Cage-Free Shell Egg Report**




120. Organic, free-range, and branded specialty eggs generally would command higher prices than standard eggs; however, during the Class Period, even conventional egg prices increased sharply. Overall, egg prices rose substantially across all categories.

**FIGURE 5: Cage Free vs. Conventional Egg Retail Price**




121. These increased prices resulted in windfall profits for Egg Producing Defendants. For example, Defendant Cal-Maine Foods saw gross profits surge from about $50 million to $535 million for the 26 weeks ending November 2022—a more than tenfold increase. Quarterly profits

rose over 600%, with margins reaching nearly 40%, much higher than typical levels for commodity foods. Other major producers, though private, likely also benefited since prices rose across the market.

122. These excessive gains suggest that Egg Producing Defendants charged well above their costs and were not simply attempting to cover increased expenses while accounting for a decrease in supply during. In fact, even analysts at the USDA recognized that the price jump was much larger than what would be expected from production decreases alone. Likewise, as numerous commentators have pointed out, avian flu-related supply restrictions cannot account for the extensive increase in egg prices throughout the Class Period.

123. Starting in early 2022, the outbreak of highly pathogenic avian influenza caused a disruption in egg supply. The virus affected commercial poultry operations, with egg-laying hens being particularly impacted.

124. However, despite the culling of about 115 million egg-laying hens, the overall number of egg-laying hens in the United States decreased only moderately, as shown in Figure 6 below. On average, the flock was 3.82% smaller each month in 2022 compared to 2021, 3.16% smaller each month in 2023, and 5.18% smaller each month in 2024.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**FIGURE 6: Table-Egg Hen Flock Size by Month**




125. Because of this reduction, monthly egg production slipped only slightly from 8.1 billion eggs in 2021 to 7.75 billion eggs by December 2024. Still, throughout 2022 to the present, per capita egg production in the United States has consistently remained above per capita egg consumption.

126. Yet, at the same time, the total value of egg production increased substantially, rising from $8.8 billion in 2021 to $19.4 billion in 2022, and subsequently reached $17.9 billion in 2023.

127. The size of these increases—and the record profits for producers—could not be explained by supply disruptions alone. According to an analysis conducted by Hunterbrook Media, between 2022 and 2024, each 1% reduction in egg production was associated with a price increase

ranging from 17% to 33%. Yet, as reported by Defendant Urner Barry, during the first avian flu outbreak of 2015, a 1% change in egg layer population led to a 6–8% price increase on average.

128. Further, as Figure 7 below shows, the decrease in egg production was far less severe than these extreme price fluctuations imply.

**Figure 7: U.S. Egg Production and Retail Prices**




129. Increases in input costs are also not sufficient to explain and justify the extreme price increases and enormous profits seen throughout the Class Period.

130. During the Class Period, egg producers experienced elevated input costs, a factor that often contributes to price increases. In 2021 and 2022, feed expenses—particularly for corn and soybean used in poultry production—rose appreciably due to global commodity inflation and the conflict in Ukraine. Additionally, costs related to fuel, transportation, and packaging escalated in line with broader inflationary trends.

131. Nonetheless, these increased expenditures were modest relative to the surge in egg prices. For instance, Cal-Maine reported that its farm production and feed costs in 2022 were approximately 22% higher than in 2021, which does not approach the 138% escalation in egg prices.

132. Likewise, the overall consumer price index for food grew by roughly 10–12% in 2022, representing only a small fraction of the rise observed in egg prices. Therefore, while inflation and cost pressures contributed to upward movement in egg prices, they do not fully account for the magnitude of the observed increases.

133. The recent surge in United States egg prices appears particularly notable when contrasted with trends in Europe, which also experienced significant supply shortages in 2022 following the depopulation of 50 million layers—compared to 43 million in the United States. Despite these disruptions, European egg prices increased by approximately 30% between January 2022 and January 2023, while United States prices rose by nearly 170% during the same period.

134. Overall, the intrinsic link between Urner Barry benchmark quotations and conventional egg prices and a lack of conventional market controls strongly suggests that the Egg Producing Defendants successfully used Defendant Urner Barry to communicate, monitor and enforce their supracompetitive pricing conspiracy throughout the Class Period.

135. This would not be the first time the egg industry and certain Egg Producing Defendants would come under scrutiny for anticompetitive behavior and unfair business practices.

**E. Prior Actions & Investigations Relating to Defendants' Conduct**

136. Participants in the egg industry, including certain Defendants Cal-Maine, Rose Acre, Hillandale, and Daybreak Foods, have a documented history of facing lawsuits and government scrutiny arising from alleged anticompetitive conduct and other unfair business practices.

137. In September 2008, private litigants commenced a series of antitrust actions against major egg producers, including Defendants Cal-Maine, Rose Acre, Hillandale, and Daybreak Foods. These actions were later consolidated as *In re Processed Egg Products Antitrust Litigation*, Case No. 08-md-2002 (E.D. Pa.), where plaintiffs alleged that the defendants engaged in a coordinated conspiracy to artificially inflate prices. Specifically, plaintiffs alleged that the producers utilized a fabricated animal-welfare program as a mechanism to restrict the domestic supply of laying hens. Following years of litigation, Cal-Maine and Hillandale both entered into settlements for millions of dollars to resolve claims asserted against them.

138. Additionally, in 2019, the matter *Kraft Foods Global, Inc. v. United Egg Producers, Inc.*, Case No. 1:11-cv-8808 (N.D. Ill.) ("*Kraft*"), was brought by a group of large-scale egg purchasers. The matter was ultimately remanded from the multi-district litigation to the Northern District of Illinois for trial. After the presentation of evidence, the jury found that the defendants, including Cal-Maine and Rose Acre, participated in a conspiracy to fix egg prices. The jury assessed damages at $17.8 million, which resulted in a total award of $53.3 million when trebled.

139. In 2020, the Texas Attorney General filed a complaint against Defendant Cal-Maine for price gouging during the COVID-19 pandemic—a violation of the Texas Deceptive Trade Practices-Consumer Protection Act. The complaint alleged that the company had misrepresented matters by claiming that its prices were based on "market quotations" that were "outside of our control," which implied there was a regulated "market."[1]

140. The New York Attorney General similarly alleged in 2020 that Defendant Hillandale leveraged the COVID-19 pandemic to inflate egg prices to "unconscionably excessive"

[1] Petition and Application for Temporary and Permanent Injunction, *State of Texas v. Cal-Maine Foods, Inc. d/b/a Wharton; and Wharton County Foods, LLC*.

levels. Hillandale purportedly justified these prices by using Urner Barry quotes, which New York alleged were part of a "feedback loop," where producers provided price assessments to Urner Barry, which then were repeated back to the industry as distilled indexed prices used for benchmarking.[2] The litigation concluded in 2021 with a settlement in which Hillandale agreed to donate 1.2 million eggs to local food banks throughout the State of New York.[3]

141. In 2021, the State of Alaska also alleged that Defendant Urner Barry facilitated an "anticompetitive output restriction scheme" by serving as a conduit for the exchange of competitively sensitive information among broiler producers.[4]

142. More recently, concerns regarding industry-wide collusion have prompted action from the United States Department of Justice ("DOJ"). In early 2025, the DOJ began investigating prominent egg producers, including Defendants Cal-Maine and Rose Acre, as part of a broad inquiry into alleged price-fixing schemes and other anti-competitive conduct.[5] News reports indicated the DOJ instructed egg producers to retain all records regarding price negotiations with customers and competitors, including any correspondence with Defendant Urner Barry.[6]

143. Defendant Cal-Maine acknowledged an ongoing DOJ investigation in its 10-Q SEC

---

[2] Verified Petition, *People of the State of New York v. Hillandale Farms Corporation, et al.*, Aug. 11, 2020.

[3] *Attorney General James Delivers 1.2 Million Eggs to New Yorkers*, OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL LETITIA JAMES (ONLINE) (Apr. 1, 2021), at https://ag.ny.gov/press-release/2021/attorney-general-james-delivers-12-million-eggs-new-yorkers.

[4] Complaint, *State of Alaska v. Agri Stats, Inc. et al.*, Sept. 23, 2021.

[5] *DOJ Investigates Whether Egg Industry Players Are Fixing Prices*, THE CAPITOL FORUM (ONLINE) (Mar. 6, 2025), available at https://thecapitolforum.com/doj-investigates-whether-egg-industry-players-are-fixing-prices/; *see also* Dave Michaels and Patrick Thomas, *Justice Department Opens Probe of Sharp Surge in Egg Prices: Antitrust enforcers are investigating whether large producers have engaged in anticompetitive conduct*, THE WALL STREET JOURNAL (ONLINE) (Mar. 7, 2025), at https://www.wsj.com/business/egg-prices-justice-department-probe-22d6a4f6.

[6] *Id.*

filing dated April 8, 2025. The company disclosed that it received a civil investigative demand "in connection with an antitrust investigation to determine whether there is, has been or may be a violation of the antitrust laws by anticompetitive conduct by and among egg producers."

144. Following the public disclosure of the investigation, egg prices dropped across the industry. As shown in Figure 8 below, wholesale costs for a dozen large Grade A white eggs fell from $8.12 on March 5, 2025 to $3.03 by March 19, 2025—a drastic 62.7% decrease in just two weeks.

**Figure 8: WHOLESALE EGG PRICES**




145. Retail prices mirrored this downward trend, suggesting the rapid and significant decline from previous levels may have been supported by coordinated behavior rather than independent market forces, as depicted in Figure 9.

**Figure 9: RETAIL EGG PRICES**




146. Furthermore, on May 8, 2025, in a bipartisan show of support, Senators Elizabeth Warren and Jim Banks urged the DOJ to scrutinize the egg industry's pricing structures. Their letter to Assistant Attorney General of the DOJ's Antitrust Division, Gail Slater, expressed skepticism toward the industry's reliance on avian flu outbreaks as a justification for high prices. Instead, the senators expressed concern regarding the high prices and suggested that the sudden price decline following the announcement of the DOJ's investigation points toward artificial inflation and coordinated conduct among major egg producers.

147. On October 1, 2025, Defendant Cal-Maine confirmed in its 10-Q SEC filing that it had been subpoenaed by the State of New York regarding an investigation into inflated egg prices and anticompetitive practices.

### F. The Structure and Characteristics of the Conventional Eggs Market Render the Conspiracy Economically Plausible

148. According to economists, the DOJ, and the United States Federal Trade Commission ("FTC"), certain features make an economic market more susceptible to collusion. The following market features make it easier for competitors to collude: (1) high concentration (*i.e.*, the market is dominated by a few large sellers); (2) high barriers to entry; (3) the industry produces a product with low demand elasticity and no close substitutes; (4) the industry produces a relatively homogenous commodity product; and (5) the employees of different companies in the industry have established social or professional relationships. These features are all present in the Conventional Eggs market.

#### 1. Market Concentration and Egg Producing Defendants' Dominance in the United States Egg Industry

149. Egg Producing Defendants collectively hold a commanding presence in the United States egg market, as they are the leading egg producers and together control nearly 40% of the overall market share. This concentration of market power allows them to exercise substantial control over pricing, supply levels, and industry practices.

150. The Egg Producing Defendants control 46% of laying hens—Cal-Maine leads with about 20% market share and 75% more hens than its nearest competitor. Their eggs mainly come from large, consolidated farms.

151. The number of egg producers in the United States declined from 2,500 in 1986 to just 700 in 2002. In 1982, half of all egg-laying hens lived on farms with 62,000 hens or less. By 2012, half of all hens lived on farms with 925,000 hens or more.

152. Among the Defendants, Cal-Maine is the nation's largest egg producer. Its operations are so expansive that it supplies more than one-fifth of all eggs consumed in the United States. This dominant position highlights Cal-Maine's central role in influencing market dynamics.

153. The present structure of the egg market reflects decades of consolidation, largely fueled by the largest producers' systematic acquisition of smaller farms. Since 1989, Cal-Maine alone has completed more than 25 acquisitions to strategically expand its production capacity and market presence. In 2023, Cal-Maine further reinforced its position by acquiring ISE America Inc. and Fassio Egg Farms, adding approximately 4.7 million and 1.2 million layers, respectively, to its flock.

154. Consolidation primarily advantages the largest participants, namely the Defendants herein. For example, Cal-Maine's net profit increased significantly from $18 million in 2020 to $785 million in 2023 and $278 million in 2024, attributable to its impact on market pricing.

155. Other leading producers have also engaged in substantial expansion efforts. In 2023, Rose Acre Farms invested $100 million to establish a new facility in Arizona designed to house 2.2 million cage-free hens. Rose Acre Farms announced plans in 2024 to add further cage-free farms in Indiana, which will accommodate an additional 1.2 to 1.3 million hens.

156. In 2023, Daybreak Foods, the fourth-largest producer, grew by acquiring Hen Haven LLC and Schipper Eggs LLC.

### 2. <u>There Are High Barriers to Entry in the Conventional Egg Industry</u>

157. Any prospective entrant into large-scale commercial egg production confronts significant barriers to both entry and exit, conditions that further entrench market concentration. These barriers include the substantial upfront capital investment necessary to purchase existing facilities or build new operations at a commercially viable scale.

158. In March 2022, Cal-Maine announced that it was expanding its cage free facilities at two of its farms at an estimated cost of $82 million. In 2023, it acquired Fasio Egg Farms for an estimated cost of $54-$67 million. A year later, Cal-Maine spent $110 million to acquire the operations of ISE America (the 23rd largest producer), including capacity for 4.7 million hens.

159. In May 2023, Rose Acre broke ground on its second Arizona facility. The Desert Valley Egg Farm, which represents an investment of over $100 million, is expected to be completed by 2026 and will house 2.2 million cage-free laying hens.

160. In 2013, the USDA published the Poultry Industry Manual: The Foreign Animal Disease Preparedness and Response Plan / National Animal Health Emergency Management System Guidelines. The report describes the high capital investment that is required to go into egg production as follows:

> A typical Midwest multi-age, in-line egg production facility contains 1.5 to 4.0 million laying hens. With a 75% average rate of lay and eggs priced at $0.95 per dozen, 1.25 to 3.0 million eggs produced each day have a market value of $98,960 to $237,500. Typical modern in-line egg production operations in the Midwest may have chickens in cages with 67 square inches per bird, grading and packing equipment, egg-breaking machines to produce liquid whole eggs, and rooms for packing, cooling, and storing eggs. Capital investment for this type of facility ranges from $24 million for an operation with 1 million chickens ($24/hen) to $80 million for a 4 million bird complex ($20/hen).

161. The high barriers to entry and exit in the Shell Egg market makes the egg industry particularly prone to collusion and makes it easier for firms to collude and keep prices high, as new competitors are unlikely to disrupt the market.

### 3. <u>**The Conventional Egg Market is Characterized by Inelastic Demand and No Close Substitutes**</u>

162. Collusion becomes more likely in markets where alternatives to the products are limited. In the United States, eggs have very few, if any, suitable substitutes.

163. Because of the lack of substitutes for eggs, the demand for eggs is relatively inelastic—that is, consumers do not refrain from buying eggs when prices rise (even substantially). At least one Defendant admitted this. In January 2025, Cal-Maine wrote in its investor presentation: “[t]he price of eggs in relation to the overall amount we spend on groceries does not

matter. A $1-2 increase in an item we purchase once a month is not that big of a deal in the grand scheme of things."

164. Economic research has shown demand for eggs to be "inelastic," meaning consumers tend not to be very responsive to changes in price. Data and research from the American Journal of Public Health support the idea that demand for eggs is inelastic. One reason for this is that eggs do not have many direct substitutes and no other food has quite the same nutritional portfolio. Whether the price of eggs goes up or down, consumers will likely still buy the number of eggs they intended to buy for the week.

165. Markets with inelastic demand are more vulnerable to collusion and price-fixing because competitors can raise prices without experiencing a material loss in sales or profits. The United States egg market is especially susceptible to collusion due to consistently inelastic consumer demand. Agricultural economist Jada Thompson explained that "[w]e demand eggs. Think about all those egg processors that are making breads. I still buy my bread. They still have to make bread. In order to make the bread, they need eggs. In order to buy those eggs, there's a low supply, so they're going to keep bidding until they get those eggs." Therefore, "Cal-Maine or any other company that is able to sell eggs during periods of high price are going to basically win out [as] they get additional prices because they have the only supply that exists."

166. Furthermore, the absence of effective substitutes, as discussed below, eliminates cross-elasticity of demand for eggs. According to research conducted by the American Egg Board, "[e]ggs possess unique nutritional properties and contribute desirable functional attributes unequaled by any single egg alternative." Consequently, buyers will not be induced to buy more or fewer eggs through price changes.

167. Because the demand for eggs is highly inelastic, Defendants have been able to

collectively raise prices to supra-competitive levels without losing revenue.

**4. <u>Conventional Eggs are a Commodity Product, Which Facilitates Collusion</u>**

168. The avoidance of price-based competition is the primary motivation for forming a cartel. When products are interchangeable, the primary way that companies can win business is by competing on price. Thus, cartels are more likely when the participants sell interchangeable products. Where a product is interchangeable, economics suggests that cartel behavior is facilitated because, amongst other things, cartel members can more easily monitor and detect defections from a price-fixing agreement.

169. Shell eggs are a commodity product. In most instances, eggs are homogenous and fungible products with no qualitative or other factors that differentiate one producer's eggs from those of any other producer. There also is little if any advertising or promotion to create any brand or other product identity. Instead, the focus is on the product itself, such as the American Egg Board's "the Incredible, Edible Egg" campaign.

**5. <u>Defendants Had Numerous Opportunities to Collude</u>**

170. Defendants had a plethora of opportunities to collude at regularly scheduled events hosted by trade associations. These events organized by a variety of industry associations and groups provided Defendants with a means to communicate and implement their conspiracy outside the public eye. More particularly, these associations hosted meetings, conferences, and committee gatherings that served as forums for high-level executives from competing companies to initiate and promote efforts of coordination.

171. The DOJ's Antitrust Division recently filed two "Statements of Interest" in private antitrust cases involving trade associations and accreditation groups, emphasizing that such rules are not exempt from antitrust laws. While not specific to agriculture or food industry associations, these filings indicate that association policies and standards can still create antitrust risks.

172. Likewise, trade associations create and disseminate "guidelines," "certification programs," and industry data that can be used as vehicles to orchestrate and monitor a collusive scheme as seen in the *Kraft* case.

173. Defendants interact regularly with United Egg Producers ("UEP"), a leading national industry association founded in 1968 to promote "the best possible environment for egg farms to prosper," as well as the American Egg Board ("AEB"), which similarly represents large United States egg producers.

174. UEP describes itself as a farmer cooperative working collaboratively to address legislative, regulatory and advocacy issues impacting egg production. UEP members represent more than 90% of all eggs produced in the United States. In 1995, UEP formed the UEA Producer Packers group to represent egg packers and producers.

175. The American Egg Board was established in 1974 under the Egg Research and Consumer Information Act to help support egg farmers in the United States and boost the demand for eggs and egg products.

176. While the AEB doesn't have member companies in the traditional sense, it is governed by 36 individual egg farmers (18 members and 18 alternates) appointed by the United States Secretary of Agriculture, representing various egg producers across the United States. The AEB is a farmer-led organization, meaning the individuals on the board bring the perspective of their own farms, which can range from large operations like those of Defendant Cal-Maine to smaller ones, to guide national egg promotion efforts. In fact, Cal-Maine pays an assessment to support the AEB and has a representative on its board of directors.

177. Beyond general membership with UEP, Defendants also occupy key leadership roles within the organization. For example, Defendant Cal-Maine's C.E.O. Sherman Miller was

elected Treasurer of the Board in 2024 and Vice Chair in 2025.

178. Defendant Rose Acre's Chairman of the Board and C.E.O. Tony Wesner is a member of the UEP Board and testified in front of Congress on behalf of UEP as recently as 2025.

179. Defendant Versova Holding's Dr. Craig Rowles, recipient of UEP's 2024 Egg Producer of the Year Award "actively contributes to the UEP Board and various committees." Versova Holdings President JT Dean also serves on UEP's Board.

180. Mark Kellen, Vice President of Operations at Defendant Daybreak Foods also serves on UEP's Board.

181. This type of high-level representation and interaction ensures a channel for executives to align their interests and exchange information.

182. In addition, the industry certification programs and guidelines issued by trade associations, like UEP, often serve as masks for collusive schemes. Indeed, during the *Kraft* litigation, the "UEP Certified Program" was singled out as the primary tool used by Defendants Cal-Maine and Rose Acre to restrict production. The fact that this program is still operational today suggests the presence of a determined framework for industry-wide coordination.

183. Throughout the Class Period, Defendants also regularly attended Urner Barry's annual Executive Conference, an event billed as the premier gathering for protein industry power players to experience "unmissable networking experiences." Apart from Defendants' personal interactions while attending this event, Defendant Cal-Maine has also served as a sponsor and Defendant Daybreak's C.E.O. Bill Rehm was a guest speaker in 2021.

184. This type of involvement at industry events and trade memberships creates a recurring opportunity for Defendants to coordinate and collude.

**G. Sharing Competitively Sensitive Information is a Plus Factor**

185. As further alleged above, the Egg Producing Defendants and their co-conspirators

exert significant market power in the Conventional Eggs market.

186. Competition is likely to be harmed when competitors with market power in a concentrated market, such as the market at issue here, exchange strategic business information about current and forward-looking plans for prices. As such, the reciprocal exchange of proprietary, competitively sensitive information between firms—details that are typically confidential—is considered "super plus factor," strongly suggesting active collusion.[7]

187. The information exchanged between the Egg Producing Defendants was competitively sensitive and a material factor in sales negotiations with customers. When market participants that are competing for the same customers exchange their strategic plans, comfort replaces uncertainty and reduces incentives to compete on price.

188. The information exchange took place in non-public settings and involved the exchange of confidential, non-public information, facilitated by Defendant Urner Barry. Since sharing private data individually could put an egg producer at a disadvantage, a rational party would only share if they expected competitors to reciprocate with similar data.

189. The market for Conventional Eggs is characterized by numerous attributes that mean the type of information exchanged by the Egg Producing Defendants is particularly likely to have anticompetitive effects. In particular, as alleged above, the market for Conventional Eggs features few sellers, commoditized products, price-based competition, and inelastic demand.

190. In addition, the Department of Justice, on numerous occasions throughout the Class Period has indicated that information exchanges alone, even absent an agreement to fix prices, could run afoul of federal antitrust law. For example, in a 2024 statement of interest in the *In re*

---

[7] Christopher R. Leslie, *The Probative Synergy of Plus Factors in Price-Fixing Litigation*, 115 Nw. Univ. L. Rev. 1581, 1608 (2021).

*Pork Antitrust Litigation*, 18-cv-01776 (D. Minn.), the DOJ stated that "(1) information sharing alone can violate Section 1, even without proof of an agreement to fix prices; and (2) information exchanges that report only aggregated data can violate the antitrust laws, even where the information is not linked to specific competitors."[8]

191. The Egg Producing Defendants' unlawful information exchanges, including through Urner Barry, were not reasonably necessary to further any procompetitive purpose. Rather, Urner Barry's forward-looking forecasts increased the risk of collusion, as Egg Producer Defendants can use these shared projections to coordinate production and pricing decisions. By relying on common market outlooks, they may adjust their behavior in parallel, enhancing the potential for anticompetitive conduct.

192. In addition to providing the means to share competitively sensitive information, Urner Barry offers participating egg producers a price-verification system, where egg producers—including the Egg Producing Defendants—can access benchmarks that indicate their position relative to others in the market, with these benchmarks derived from actual sales data. Without a conspiratorial agreement between the parties, this form of price-verification would not be effective.

193. Urner Barry also offers egg producers, including the Egg Producing Defendants, an incentive to conspire by publicly stating that it supplies valuable information aimed at supporting profit maximization.

## V. <u>CLASS ACTION ALLEGATIONS</u>

194. Plaintiff brings this action on behalf of himself and as a class action under the

[8] *In Re Pork Antitrust Litigation*, No. 18-cv-01776, Statement of Interest of the United States, ECF No. 2616 at 3 (D. Minn. Oct. 1, 2024).

provisions of Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure on behalf of the members of a class of commercial indirect purchasers seeking injunctive relief (the "Nationwide Class") defined as follows:

> All persons and entities in the United States who indirectly purchased Conventional Eggs from the Egg Producing Defendants or their co-conspirators for non-commercial purposes from January 1, 2022 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

195. Plaintiff also brings this action on behalf of himself, and all others similarly situated as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class (the "State Law Class"):

> All persons and entities who indirectly purchased Conventional Eggs from the Egg Producing Defendants or their co-conspirators for non-commercial purposes in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, the District of Columbia, Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and/or Puerto Rico from January 1, 2022 until such time that the adverse effects of Defendants' anticompetitive conduct cease.

196. Specifically excluded from the Nationwide Class and State Law Class (collectively "Classes") are Defendants the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; any affiliate, legal representative, heir, or assign of any Defendant; and any government entity. Also excluded from these Classes is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-conspirator identified in this action.

197. **Numerosity**: Plaintiff does not know the exact number of Class Members[9] because such information presently is under exclusive control of Defendants. However, Plaintiff believes that due to the nature of the trade and commerce involved, there are millions of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members is impracticable.

198. **Typicality**: Plaintiff's claims are typical of the claims of the Classes because Plaintiff purchased Conventional Eggs indirectly from one or more of the Defendants for non-commercial purposes, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Classes and the relief sought is common to the Classes.

199. **Common Questions Predominate**: There are questions of law and fact common to the Classes, including, but not limited to:

A. Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of Conventional Eggs sold in interstate commerce in the United States;

B. The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

C. Whether the alleged conspiracy violated the antitrust laws alleged herein;

D. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiff and Class Members;

E. The effect of Defendants' alleged conspiracy on the prices of Conventional Eggs

[9] Class Members refers to the members of the Classes as defined in this Complaint.

sold in the United States and applicable states listed in the State Law Class during the Class Period;

F. Whether Plaintiff and other members of the Classes are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

G. The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Classes predominate over any questions affecting only individual members of the Classes.

200. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Classes who indirectly purchased Conventional Eggs for commercial purposes during the Class Period and Plaintiff has retained competent counsel and experienced in the prosecution of class actions and antitrust litigation to represent him and the Classes.

201. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class Members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class Members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single

court.

202. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

203. **Common Grounds for Injunctive Relief:** Defendants have taken actions that generally impact the Classes in a consistent manner so that final injunctive relief is appropriate for the Classes collectively under Fed. R. Civ. P. 23(b)(2).

## VI. DEFENDANTS ARE ENGAGED IN CONTINUING ANTITRUST VIOLATIONS

204. During the Class Period, Defendants continued to sell Conventional Eggs to Plaintiff and other putative Class Members at prices artificially inflated by Defendants' price-fixing conspiracy. The artificial increases to the pricing of Conventional Eggs set forth in this Complaint had long lasting and continuing effects which resulted in Class Members continuing to pay artificially inflated prices for Conventional Eggs continuing through the present. Furthermore, Class Members purchased Conventional Eggs frequently and consistently throughout the Class Period.

205. Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their price-fixing agreement. This resulted in multiple coordinated price increases throughout the Class Period, as described herein. Moreover, each of these activities resulted in new, overt acts that injured Plaintiff and the putative Classes, thus creating a new cause of action for purposes of the statute of limitations.

206. In addition, each sale of Conventional Eggs made to Plaintiff or the putative Classes that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

207. These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiff and the other members of the proposed Classes.

208. As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- and estoppel-related arguments, Plaintiff's claims and those of the putative Classes are not time barred.

## VII. PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE, THE CLAIMS IN THIS LAWSUIT EARLIER

209. Plaintiff's antitrust claims are governed by the discovery rule—*i.e.*, the statute of limitations does not begin to run until discovery of the injury from the alleged violation. Prior to the investigation and analysis performed by and for Plaintiff's counsel, Plaintiff and putative Class Members did not know—nor could they have known through the exercise of reasonable diligence—that the prices they were paying for Conventional Eggs were artificially inflated and causing them injury.

210. Furthermore, even assuming Plaintiff could have somehow discovered their injury sooner (which is not the case), they could not have determined that those injuries were the result of Defendants' price-fixing conspiracy. As discussed below, not only did Defendants never reveal the existence of their price-fixing conspiracy, they also actively concealed its existence by, among other things, blaming price increases on rising raw material, packaging, labor, and energy costs, as well as environmental conditions such as heatwaves and droughts. Plaintiff did not know and had no reasonable way of knowing that these statements were false and, in fact, they were being injured by Defendants' price-fixing conspiracy.

211. For these reasons, both the discovery rule and the doctrine of equitable tolling dictate that all of Plaintiff's claims and those of the putative Classes, going back to the beginning of the Class Period, are timely.

## VIII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

212. Throughout the Class Period, each of the Defendants effectively, affirmatively, and fraudulently concealed their conspiracy from Plaintiff and putative Class Members.

213. In engaging in the price increases and other conspiratorial acts set forth in this Complaint, the Defendants pointed to and utilized false and misleading pretexts, including assertions that the price increases were due to supply constraints because of an avian flu outbreak as well as increase in the costs of other inputs for Conventional Eggs. As set forth herein, and based on Plaintiff's analysis, such pretexts cannot explain or justify the prices increases set forth herein and were intended to conceal Defendants' conspiracy.

214. For example, in April 2022, Defendant Urner Barry tried to hype up the continued doom of volatile egg prices in the wake of the onset of the avian flu towards the end of 2021, warning that depending "on how the industry handles (avian flu) this time around, consumers may expect additional pressures on Shell Egg prices—ultimately pushing prices even higher."[10]

215. The pretextual explanations were intended to and did conceal the existence of Defendants' price fixing agreement from the Class Members. As a result of this active concealment, Plaintiff and putative Class Members neither knew, nor in the exercise of due diligence could they have reasonably known, of the facts that form the basis for their claims. Thus, even if the discovery rule or equitable tolling were somehow inapplicable, Defendants should

---

[10] *UB Consulting: Why the Rise in Egg Price?* Urner Berry, Jan. 20, 2023, https://urnerbarry.com/Consulting/Blog/UBC-Blog/1244188 (last accessed Jan. 18, 2026).

nonetheless be estopped from raising any statute of limitations defense.

## IX. RELEVANT MARKET

216. This action alleges that the Defendants engaged in *per se* violations of federal and state antitrust laws. In the alternative, Plaintiff also allege that under Section 1 of the Sherman Act and the various state laws, the Defendants' agreement to unlawfully exchange competitively sensitive business information amongst Conventional Egg Producers violates the rule of reason.

217. The Conventional Egg Producing Defendants compete in the conventional eggs market for sales of "Shell Eggs" or "table eggs" to customers; the form of eggs most familiar to consumers and most likely to be sold to consumer at retail at grocery stores, convenience stores and similar establishments.

218. Conventional Shell Eggs—distinct from specialty types like cage-free, organic, or pasture-raised—dominate U.S. sales. In 2024, they comprised nearly 75% of the market, with cage-free at 23.2%, and pasture-raised under 5%.[11]

219. The Egg Producing Defendants' agreement to exchange competitively sensitive business information, including through Urner Barry, has enabled the Egg Producing Defendants to reduce competition in the Conventional Eggs market.

220. The relevant product market is the market for Conventional Eggs.

221. The relevant geographic market is the United States.

222. As alleged above, high barriers to entry into the Conventional Eggs market exist, preventing other entrants or would-be competitors from entering the market.

---

[11] Basel Musharbash, "*Kings Over the Necessaries of Life": Monopolization and the Elimination of Competition in America's Agriculture System*, FARM ACTION, Sept. 2024, https://farmaction.us/wp-content/uploads/2024/09/Kings-Over-the-Necessaries-of-Life-Monopolization-and-the-Elimination-of-Competition-in-Americas-Agriculture-System_Farm-Action.pdf?utm_source=substack&utm_medium=email (last accessed Jan. 18, 2026).

## X. ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

223. Defendants' anticompetitive conduct had the following effects, among others:

A. Price competition was restrained or eliminated with respect to Conventional Eggs;

B. The prices of Conventional Eggs were fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Indirect purchasers of Conventional Eggs were deprived of free and open competition; and

D. Indirect purchasers of Conventional Eggs paid artificially inflated prices.

224. The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of Conventional Eggs. As a direct and foreseeable result, Plaintiff and the Classes paid supra-competitive prices for Conventional Eggs during the Class Period.

225. The price effects of Defendants' conduct particularly impacted the consumer Class Members in this case who had no choice but to pay higher prices for Conventional Eggs they were unable to purchase or acquire elsewhere amidst a plethora of rising costs across the economy.

226. By reason of the alleged violations of the antitrust laws, Plaintiff and the Classes sustained injury to their businesses or property, having paid higher prices for Conventional Eggs than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy.

227. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## XI. CLAIMS FOR RELIEF

**COUNT 1**
**RESTRAINT OF TRADE IN VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

228. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

229. Egg Producing Defendants are direct competitors in the Conventional Eggs market throughout the United States.

230. Beginning as early as January 1, 2022, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by artificially reducing or eliminating competition for the pricing of Conventional Eggs. The agreement was intended to and did unreasonably restrain trade and suppress competition with the purpose and effect of artificially raising, fixing, maintaining, or stabilizing prices in the Conventional Eggs market in the United States. Pursuant to the agreement, Defendants agreed to and did manipulate the egg industry pricing indices in a manner that distorted and suppressed competition in the relevant market knowing and intending that the information would be used to raise, fix, maintain, or stabilize prices of Conventional Eggs sold to Plaintiff and members of the Class.

231. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

232. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for Conventional Eggs throughout the United

States to be higher than they otherwise would have been in a competitive market.

233. Defendants' conspiratorial acts caused unreasonable restraints in the market for Conventional Eggs.

234. As a result of Defendants' unlawful conduct, Plaintiff and the members of the Nationwide Class were harmed by being forced to pay inflated, supra-competitive prices for Conventional Eggs.

235. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition in the market for Conventional Eggs was restrained, suppressed, and/or eliminated in the United States;

B. Prices for Conventional Eggs sold by Defendants, their divisions, subsidiaries, and affiliates, and all their co-conspirators were fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiff and members of the Nationwide Class were deprived of the benefits of free and open competition in the purchase of Conventional Eggs.

236. Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of Conventional Eggs to be higher than it would be, but for Defendants' conduct.

237. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Nationwide Class were injured in their business or property and will continue to be injured in their business and property by paying more for Conventional Eggs than they would

have paid and will pay in the absence of the conspiracy.

238. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

**COUNT 2**
**UNLAWFUL EXCHANGE OF COMPETITIVE INFORMATION IN VIOLATION OF THE SHERMAN ACT,**
**15 U.S.C. § 1**
**(On Behalf of Nationwide Class for Injunctive and Equitable Relief)**

239. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

240. Beginning at a time currently unknown to Plaintiff, but at least as early as January 1, 2022, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about the Egg Producing Defendants' operations. Defendant Urner Barry facilitated this information exchange, which included pricing data generated by Defendant ECI. This is an unreasonable restraint on trade and an independent violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

241. For purposes of this Count, which is based upon a claim subject to a rule of reason analysis, the relevant product market is Conventional Eggs, and the relevant geographic market is the continental United States. Egg Producing Defendants possessed market power in the relevant product market during the Class Period.

242. Conventional Eggs are fungible products. Conventional Eggs are generally interchangeable, permitting Egg Producing Defendants to readily share competitively sensitive information, with the assistance and cooperation of Defendant Urner Barry, that would harm competition in the relevant market.

243. The information regularly exchanged by Defendants pursuant to the agreement

consisted of detailed, competitively sensitive, and non-public information about pricing regarding Conventional Eggs. Defendants' information exchanges were in the form of communications via telephone, text, and e-mail. Defendants were able to share and discuss real-time and forward-looking prices and pricing strategies with their competitors.

244. Egg Producing Defendants' regular information exchanges reflected the concerted action between horizontal competitors in the Conventional Eggs market.

245. Each Egg Producing Defendant furnished competitively sensitive information to other Defendants with the understanding that it would be reciprocated.

246. The agreement to regularly exchange, and the actual exchange of detailed and non-public information about current and future pricing suppressed competition between Egg Producing Defendants, and specifically permitted Egg Producing Defendants to agree upon, coordinate, and enforce price increases.

247. When market participants competing for the same customers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Egg Producing Defendants used data to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering, and intending to offer, with respect to price in the Conventional Eggs market. This strategic information exchange facilitated and supported by Defendant Urner Barry was a material factor in Defendants' agreements to inflate the prices that Plaintiff and Class Members ultimately paid for Conventional Eggs during the Class Period.

248. Defendants' unlawful agreements to exchange, and the actual exchanges of the non-public, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.

249. The information exchange agreement has had the effect of: (1) suppressing competition among Egg Producing Defendants in the Conventional Eggs market in the United States; and (2) inflating the prices of Conventional Eggs during the Class Period.

250. As a result of the unlawful agreement alleged herein to exchange information, Plaintiff and Class Members have been injured in their business or property by paying artificially inflated prices for Conventional Eggs during the Class Period. Plaintiff and Class Members are entitled to injunctive relief against Defendants, preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS

251. Plaintiff re-alleges and incorporates by reference all the allegations above as if fully set forth herein, excluding the causes of actions, into each of the state specific cause of actions described below.

252. During the Class Period, Defendants and their co-conspirators entered and engaged in a contract, combination, or conspiracy to fix, raise, maintain, and stabilize the price of Conventional Eggs prices in various states to unreasonably restrain trade and commerce and harm consumers in violation of the various state antitrust and consumer protection laws set forth below.

253. In formulating and effectuating this conspiracy, Defendants and their co-conspirators performed acts in furtherance of the alleged combination and conspiracy, including agreeing to fix, raise, maintain, and stabilize the price of Conventional Eggs which injured Plaintiff and members of the State Law Class.

254. Defendants and their co-conspirators engaged in actions described above for the purpose of carrying out their unlawful agreements to fix, increase, maintain, or stabilize Conventional Eggs prices at artificially high levels. As a direct and proximate result of Defendants' conduct, Plaintiff and members of the State Law Class were deprived of free and open competition

and paid more to purchase Conventional Eggs than they otherwise would have in the absence of Defendants' unlawful conduct. This injury is of the type that the antitrust and consumer protection laws of the below states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

255. In addition, Defendants profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct and come at the expense of and to the detriment of Plaintiff and members of the State Law Class.

256. Accordingly, Plaintiff and the members of the State Law Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by each jurisdiction's law, injunctive relief (where applicable), and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

257. Defendants' anticompetitive acts described above were knowing, willful, and constitute violations of the following state antitrust and consumer protection statutes.

**COUNT 3: ALABAMA**
**VIOLATION OF ALABAMA CODE §§ 6-5-60, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Alabama)**

258. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

259. Due to Defendants' unlawful conduct, (1) competition for Conventional Eggs was restrained, suppressed, and eliminated within Alabama; (2) Conventional Eggs prices in the State of Alabama were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition.

260. Defendants' agreement was an unlawful agreement to restrain trade in the State of Alabama in violation of Alabama Code §§ 6-5-60, *et seq*. Defendants' conspiracy substantially

affected Alabama commerce and accordingly, Plaintiff and the members of the State Law Class seek all forms of relief available under Alabama Code §§ 6-5-60, *et seq*.

**COUNT 4: ARIZONA**
**VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. §§ 44-1401, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Arizona)**

261. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

262. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Arizona; (2) prices of Conventional Eggs in the State of Arizona were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

263. Defendants' agreement was an unlawful agreement to restrain trade in the State of Arizona in violation of Arizona Revised Statutes §§ 44-1401, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Arizona Revised Statutes §§ 44-1401, *et seq*.

**COUNT 5: ARKANSAS**
**VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. §§ 4-88-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Arkansas)**

264. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

265. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Arkansas; (2) prices of Conventional Eggs in the State of Arkansas were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class

Period, Defendants' illegal conduct substantially affected Arkansas commerce.

266. Defendants' conspiracy unlawfully misleads consumers into believing the price of Conventional Eggs sold in Arkansas was the result of a free market and Defendants' conduct is substantively unconscionable because it unfairly benefits Defendants at the expense of Plaintiff and members of the Class. Arkansas Code Annotated § 4-88-107. Accordingly, Plaintiff and members of the State Law Class seek all available relief under Arkansas Code Annotated §§ 4-88-101, *et seq*., resulting from Defendants' deceptive and unconscionable trade practices.

**COUNT 6: CALIFORNIA**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 16700, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in California)**

267. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

268. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout California; (2) Conventional Eggs prices in the State of California were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected California commerce and consumers.

269. Defendants entered into an unlawful agreement in restraint of trade in violation of California Business and Professions Code §§ 16700, *et seq.* During the Class Period, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce. Each defendant has acted in violation of California Business and Professions Code § 16720 to fix, raise, maintain, and stabilize the price of Conventional Eggs. The violations of California Business and Professions Code § 16720 consisted, without limitation, of a continuing unlawful trust and concert of action among Defendants and their co-conspirators, the substantial

terms of which were to fix, raise, maintain, and stabilize the price of Conventional Eggs. For the purpose of forming and effectuating the unlawful trust, Defendants and their co-conspirators did those things which they combined and conspired to do, including, but not limited to, the acts, practices and course of conduct set forth above, and creating a price floor, fixing, raising, and stabilizing the prices of Conventional Eggs. As a result of Defendants' violation of California Business and Professions Code § 16720, Plaintiff and members of the Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to California Business and Professions Code § 16750(a).

**COUNT 7: CALIFORNIA**
**VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in California)**

270. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

271. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of California Business and Professions Code §§ 17200, *et seq*., and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

272. Defendants' acts and practices are unfair in that: (1) they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; (2) they harmed and continue to harm consumers in a manner far outweighing any legitimate utility of their conduct; (3) the injury was not one that consumers reasonably could have avoided; and (4) they were contrary to legislatively declared and public policy.

273. Defendants financially benefited from their conduct to the financial detriment of Plaintiff and Class Members.

274. As a direct and proximate result of Defendants' unlawful and unfair acts and practices, Plaintiff and Class Members suffered substantial injury in fact, and lost money and/or

property. The injuries suffered by Plaintiff and Class Members include, but are not limited to, paying higher prices for Conventional Eggs than they would have otherwise paid in the absence of Defendants' anticompetitive conspiracy.

275. Defendants' conduct is continuing and unless injunctive relief is granted, artificially and anticompetitively inflated prices for Conventional Eggs will continue unabated.

276. Defendants thus have engaged in unlawful and unfair business acts and practices in violation of California Business and Professions Code §§ 17200, *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 8: COLORADO**
**VIOLATION OF THE COLORADO ANTITRUST ACT,**
**COLO. REV. STAT. §§ 6-4-101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Colorado)**

277. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

278. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Colorado; (2) Conventional Eggs prices in the State of Colorado were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Colorado commerce and consumers.

279. Defendants violated Colorado Revised Statutes §§ 6-4-101, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under violated Colorado Revised Statutes §§ 6-4- 101, *et seq*.

**COUNT 9: COLORADO**
**VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT,**
**COLO. REV. STAT. §§ 6-1-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Colorado)**

280. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

281. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Colorado Revised Statutes §§ 6-1-101, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 10: CONNECTICUT**
**VIOLATION OF THE CONNECTICUT ANTITRUST ACT,**
**CONN. GEN. STAT. §§ 35-24, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Connecticut)**

282. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

283. Defendants entered into an unlawful agreement in restraint of trade in violation of Connecticut General Statutes §§ 35-24, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout Connecticut, and (2) Conventional Eggs prices in the State of Connecticut were fixed, controlled, and maintained at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Connecticut commerce.

284. As such, Defendants entered into agreements in restraint of trade in violation of Connecticut General Statutes §§ 35-24, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Connecticut General Statutes § 35-24, *et seq.*

**COUNT 11: DISTRICT OF COLUMBIA**
**VIOLATION OF DISTRICT OF COLUMBIA CODE §§ 28-4501, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in the District of Columbia)**

285. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

286. Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the District of Columbia; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; and (3) Plaintiff and members of the Class, including those who resided in the District of Columbia and purchased Conventional Eggs in the District of Columbia, paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected commerce in the District of Columbia.

287. Defendants entered into agreements in restraint of trade in violation of D.C. Code §§ 28-4501, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under D.C. Code, §§ 28-4501, *et seq*.

**COUNT 12: DISTRICT OF COLUMBIA**
**VIOLATION OF THE DISTRICT OF COLUMBIA CONSUMER PROTECTION ACT, D.C. CODE §§ 28-3901, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in the District of Columbia)**

288. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

289. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of D.C. Code, §§ 28-3901, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 13: FLORIDA**
**VIOLATION OF**
**THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,**
**FLA. STAT. §§ 501.201, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Florida)**

290. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

291. Through Defendants' actions and actions of co-conspirators, Conventional Eggs prices in the State of Florida were raised, fixed, maintained, and stabilized at artificially high level, thereby injuring Plaintiff and the State Law Class. Throughout the Class Period, competition in the Conventional Eggs market was restrained, suppressed, and eliminated throughout Florida. Plaintiff and members of the State Law Class, including those who purchased Conventional Eggs in the State of Florida, paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected commerce in Florida.

292. Defendants violated the Fla. Stat. §§ 542.15, *et seq.*, through their anticompetitive actions, and, therefore, Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Fla. Stat. §§ 501.201, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 14: HAWAII**
**VIOLATION OF HAWAII ANTITRUST LAW,**
**HAW. REV. STAT. ANN. §§ 480-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Hawaii)**

293. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

294. Defendants violated Haw. Rev. Stat. Ann. §§ 480-1, *et seq.*, through their actions. *See* Haw. Rev. Stat. Ann. §§ 480-4, 480-13. Through Defendants' actions and the actions of their co-conspirators, Conventional Eggs prices in the State of Hawaii were raised, fixed, maintained,

and stabilized at artificially high levels, thereby injuring Plaintiff and the State Law Class. Throughout the Class Period, price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Hawaii. Plaintiff and members of the State Law Class, including those who resided in the State of Hawaii and purchased Conventional Eggs in Hawaii, paid supra-competitive, artificially inflated prices for their Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected commerce in Hawaii.

295. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Haw. Rev. Stat. Ann. §§ 480-1, *et seq*.

**COUNT 15: ILLINOIS**
**VIOLATION OF THE ILLINOIS ANTITRUST ACT,**
**740 ILL. COMP. STAT. §§ 10/1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Illinois)**

296. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

297. Defendants' combination or conspiracy had the following effects: (1) price competition in the Conventional Eggs market was restrained, suppressed, and eliminated throughout the State of Illinois, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Illinois. During the Class Period, Defendants' illegal conduct substantially affected Illinois commerce.

298. Defendants entered into agreements in restraint of trade in violation of 740 Ill. Comp. Stat. 10/1, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under 740 Ill. Comp. Stat. 10/1, *et seq*.

**<u>COUNT 16: ILLINOIS</u>**
**VIOLATION OF**
**THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILL. COMP. STAT. ANN. §§ 505/1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Illinois)**

299. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

300. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. 505/1, *et seq.*, and 720 Ill. Comp. Stat. 295/1a, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**<u>COUNT 17: IOWA</u>**
**VIOLATION OF THE IOWA COMPETITION LAW, IOWA CODE §§ 553.1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Iowa)**

301. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

302. Defendants entered into an unlawful agreement in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Iowa, and (2) Conventional Eggs prices were raised, fixed, maintained and stabilized at artificially high levels throughout the State of Iowa.

303. During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce. By reason of the foregoing, Defendants entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Iowa Code §§ 553.1, *et seq.*

**COUNT 18: KANSAS**
**VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,**
**KAN. STAT. ANN. §§ 50-101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Kansas)**

304. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

305. Defendants entered into an unlawful agreement in restraint of trade in violation of Kansas Statutes Annotated §§ 50-101, *et seq.* Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Kansas; (2) Conventional Eggs prices in the State of Kansas were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

306. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Kansas Statutes Annotated §§ 50-101, *et seq*.

**COUNT 19: MAINE**
**VIOLATION OF THE MAINE ANTITRUST STATUTE,**
**ME. STAT. TIT. 10, §§ 1101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Maine)**

307. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

308. Defendants entered into an unlawful agreement in restraint of trade in violation of Maine Revised Statutes Title 10 § 1101. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Maine; and (2) Conventional Eggs prices in the State of Maine were raised, fixed, maintained, and stabilized at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

309. Accordingly, Plaintiff and members of the State Law Class seek all relief available under Maine Revised Statutes Title 10 § 1104.

**COUNT 20: MARYLAND**
**VIOLATION OF THE MARYLAND ANTITRUST ACT,**
**MD. CODE §§ 11-209(a), *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Maryland)**

310. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

311. Defendants' combination or conspiracy detrimentally affected the price competition in the State of Maryland for Conventional Eggs by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Conventional Eggs prices in the State of Maryland at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected Maryland commerce.

312. Defendants violated the Maryland Code §§ 11-201, *et seq.*, by entering into unlawful agreement in restraint of trade in the State of Maryland. Accordingly, Plaintiff and members of the State Law Class seek all relief available under Maryland Code §§ 11-201, *et seq*.

**COUNT 21: MASSACHUSETTS**
**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION LAW,**
**MASS. GEN. LAWS ANN. Ch. 93A §§ 1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Massachusetts)**

313. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

314. Defendants' combinations or conspiracies had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Massachusetts, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Massachusetts. During the Class Period,

Defendants' illegal conduct substantially affected Massachusetts commerce.

315. Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Mass. Gen. Laws Ann. Ch. 93A §§ 1, *et seq*. by entering into unlawful agreement in restraint of trade in the State of Massachusetts and, accordingly, Plaintiff and members of the Class seek all relief available under that statute.

**<u>COUNT 22: MICHIGAN</u>**
**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,**
**MICH. COMP. LAWS §§ 445.771, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Michigan)**

316. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

317. Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Michigan, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Michigan. During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

318. Defendants entered into an unlawful agreement in restraint of trade in violation of Michigan Compiled Laws §§ 445.771, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all relief available under Michigan Compiled Laws §§ 445.771, *et seq*.

319. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Michigan Compiled Laws §§ 445.903, *et seq*., and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**<u>COUNT 23: MICHIGAN</u>**
**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT,**
**MICH. COMP. LAWS §§ 445.903, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Michigan)**

320. Plaintiff incorporates by reference the allegations in the preceding paragraphs,

excluding causes of action.

321. Defendants have engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of Michigan in violation of Michigan Compiled Laws §§ 445.903, *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 24: MINNESOTA**
**VIOLATION OF THE MINNESOTA ANTITRUST LAW,**
**MINN. STAT. §§ 325D.49, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Minnesota)**

322. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

323. Through their actions and actions of co-conspirators, Conventional Eggs prices in the State of Minnesota were raised, fixed, maintained, and stabilized at an artificially high level, thereby injuring Plaintiff and the State Law Class. Throughout the Class Period, price competition in the market for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Minnesota. Plaintiff and members of the State Law Class, including those who resided in the State of Minnesota and purchased Conventional Eggs there, paid supra-competitive, artificially inflated prices for Conventional Eggs. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Minnesota.

324. Defendants violated Minnesota Statutes §§ 325D.49, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Minnesota Statutes §§ 325D.49, *et seq*.

**COUNT 25: MINNESOTA**
**VIOLATION OF THE MINNESOTA DECEPTIVE TRADE PRACTICES ACT,**
**MINN. STAT. §§ 325D.43, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Minnesota)**

325. Plaintiff incorporates by reference the allegations in the preceding paragraphs,

excluding causes of action.

326. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation Minnesota Statutes §§ 325d.43-48, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 26: MISSISSIPPI**
**VIOLATION OF THE MISSISSIPPI ANTITRUST LAW,**
**MISS. CODE ANN. §§ 75-21-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Mississippi)**

327. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

328. Defendants entered into an unlawful agreement in restraint of trade in violation of Mississippi Code Annotated §§ 75-21-1, *et seq. See* MISS. CODE ANN. § 75-57-63. Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Mississippi, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected the State of Mississippi commerce.

329. Accordingly, Plaintiff and members of the State Law Class seek all relief available under Mississippi Code Annotated §§ 75-21-1, *et seq.*, and § 75-57-63.

**COUNT 27: MONTANA**
**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT,**
**MONT. CODE, §§ 30-14-101, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Montana)**

330. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

331. By reason of the conduct alleged herein, Defendants have violated Montana Code §§ 30-14-101, *et seq*. Defendants' unlawful conduct had the following effects: (1) Conventional

Eggs price competition was restrained, suppressed, and eliminated throughout Montana; (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Montana; (3) Plaintiff was deprived of free and open competition; and (4) Plaintiff and members of the Class paid supracompetitive, artificially inflated prices for Conventional Eggs.

332. During the Class Period, Defendants' illegal conduct substantially affected Montana commerce and consumers. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff was injured and are threatened with further injury. Accordingly, Plaintiff and members of the Class seek all relief available under the Montana Consumer Protection Act of 1973, Montana Code §§ 30-14-101, *et seq*.

**COUNT 28: NEBRASKA**
**VIOLATION OF THE NEBRASKA JUNKIN ACT, NEB. REV. STAT. §§ 59-801, *et seq*.**
**(On Behalf of Class Members that Purchased Conventional Eggs in Nebraska)**

333. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

334. Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Nebraska, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of Nebraska. During the Class Period, Defendants' illegal conduct substantially affected the State of Nebraska commerce.

335. Defendants restrained trade and commerce in the State of Nebraska by entering into an unlawful agreement in violation of Nebraska Revised Statutes §§ 59-801, *et seq*. Accordingly, Plaintiff and members of the State Law Class seek all relief available under Nebraska Revised Statutes §§ 59-801, *et seq*.

**COUNT 29: NEBRASKA**
**VIOLATION OF THE NEBRASKA DECEPTIVE TRADE PRACTICES ACT, NEB. REV. STAT. §§ 59-1601, *et seq*.**
**(On Behalf of Class Members that Purchased Conventional Eggs in Nebraska)**

336. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

337. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nebraska Revised Statutes §§ 59-1601, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 30: NEVADA**
**VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. §§ 598A, *et seq*.**
**(On Behalf of Class Members that Purchased Conventional Eggs in Nevada)**

338. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

339. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Nevada; (2) Conventional Eggs prices in the State of Nevada were raised, fixed, maintained, stabilized at artificially high levels; and (3) individuals been deprived of free and open competition.

340. Defendants violated the Nevada Revised Statutes Annotated §§ 598A.210, *et seq.*, by entering into unlawful agreements in restraint of trade in the State of Nevada. As a result of Defendants' violation of Nevada Revised Statutes Annotated §§ 598A.210, *et seq.* Plaintiff and members of the State Law Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to Nevada Revised Statutes Annotated § 598A.210.

**COUNT 31: NEVADA**
**VIOLATION OF THE NEVADA DECEPTIVE TRADE PRACTICES ACT,**
**NEV. REV. STAT. §§ 598.0903, *et seq.***
**(On Behalf of Class Members that Purchased Conventional Eggs in Nevada)**

341. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

342. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Nevada Revised Statutes Annotated §§ 598.0903, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 32: NEW HAMPSHIRE**
**VIOLATION OF THE NEW HAMPSHIRE ANTITRUST LAW,**
**N.H. REV. STAT. ANN. §§ 356:1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in New Hampshire)**

343. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

344. Defendants' combination or conspiracy detrimentally affected the price competition in the State of New Hampshire Conventional Eggs market by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Conventional Eggs prices in the State of New Hampshire at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Hampshire commerce.

345. Defendants entered into an unlawful agreement in restraint of trade in violation of New Hampshire Revised Statutes Annotated §§ 356:1, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all relief available under New Hampshire Revised Statutes Annotated §§ 356:1, *et seq.*

**COUNT 33: NEW HAMPSHIRE**
**VIOLATION OF THE NEW HAMPSHIRE CONSUMER PROTECTION ACT,**
**N.H. REV. STAT. ANN. §§ 358-A:1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in New Hampshire)**

346. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

347. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Hampshire Revised Statutes Annotated §§ 358-A:1, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 34: NEW JERSEY**
**VIOLATION OF THE NEW JERSEY ANTITRUST ACT,**
**N.J. STAT. ANN. §§ 56-9-3, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in New Jersey)**

348. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

349. Defendants' conspiracy detrimentally affected the price competition for Conventional Eggs purchased in the State of New Jersey by restraining, suppressing, and eliminating competition. Further, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Conventional Eggs prices in the State of New Jersey at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected the State of New Jersey commerce.

350. Defendants engaged in a conspiracy in restraint of the trading of Conventional Eggs in violation of the New Jersey Antitrust Act, N.J. Stat. Ann. § 56:9-3. Accordingly, Plaintiff and members of the Class seek equitable relief and compensatory damages, together with reasonable attorneys' fees, filing fees and reasonable costs of suit, including but not limited to expenses of discovery and document reproduction. N.J. Stat. Ann. § 56:9-12.

**COUNT 35: NEW JERSEY**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT,**
**N.J. STAT. ANN. §§ 56-8-2, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in New Jersey)**

351. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

352. Defendants engaged in unfair competition or unfair or deceptive acts or practices by conspiring to restrain trade in the State of New Jersey in violation of N.J. Stat. Ann. §§ 56-8-2, *et seq*. Accordingly, Plaintiff and members of the Class seek all forms of relief available under the relevant statute.

**COUNT 36: NEW MEXICO**
**VIOLATION OF THE NEW MEXICO ANTITRUST LAW,**
**N.M. STAT. ANN. §§ 57-1-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in New Mexico)**

353. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

354. Defendants' combination or conspiracy detrimentally affected the price competition in the State of New Mexico for Conventional Eggs by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained and stabilized Conventional Eggs prices in the State of New Mexico at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of New Mexico.

355. Defendants violated the New Mexico Statutes Annotated §§ 57-1-1, *et seq.*, by entering into unlawful agreements in restraint of trade in the State of New Mexico. Accordingly, Plaintiff and Members of the State Law Class seek all relief available under New Mexico Statutes Annotated §§ 57-1-1, *et seq*.

**COUNT 37: NEW MEXICO**
**VIOLATION OF THE NEW MEXICO UNFAIR PRACTICES ACT, N.M. STAT. ANN. §§ 57-12-1, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in New Mexico)**

356. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

357. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Statutes Annotated §§ 57-12-1, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 38: NEW YORK**
**VIOLATION OF THE DONNELLY ACT, N.Y. GEN. BUS. LAW §§ 340, *et seq*.**
**(On Behalf of Class Members that Purchased Conventional Eggs in New York)**

358. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

359. Defendants entered into an unlawful agreement in restraint of trade in violation of New York General Business Law §§ 340, *et seq.* Defendants' conspiracy had the following effects: (1) price competition in the market for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of New York, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of New York. During the Class Period, Defendants' illegal conduct substantially affected the State of New York commerce. The conduct set forth above is a *per se* violation of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340, *et seq.*

360. Accordingly, Plaintiff and members of the State Law Class seek all relief available under New York General Business Law §§ 340, *et seq*.

**COUNT 39: NORTH CAROLINA**
**VIOLATION OF THE NORTH CAROLINA UNFAIR TRADE AND BUSINESS PRACTICES ACT, N.C. GEN. STAT. §§ 75-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in North Carolina)**

361. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

362. Defendants entered into an unlawful agreement in restraint of trade in violation of North Carolina General Statutes §§ 75-1, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition in the market for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of North Carolina, and (2) Conventional Eggs prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the State of North Carolina. During the Class Period, Defendants' illegal conduct substantially affected the State of North Carolina commerce.

363. Accordingly, Plaintiff and members of the State Law Class seek all relief available under North Carolina General Statutes §§ 75-1, *et seq.*

**COUNT 40: NORTH DAKOTA**
**VIOLATION OF THE NORTH DAKOTA UNFAIR TRADE PRACTICES LAW, N.D. CENT. CODE §§ 51-10, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in North Dakota)**

364. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

365. Defendants' actions violated North Dakota Century Code §§ 51-08.1-01, *et seq.* through their anticompetitive actions. Through their actions and actions of co-conspirators, Conventional Eggs prices in the State of North Dakota were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and members of the State Law Class. Throughout the Class Period, price competition in the market for Conventional Eggs was

restrained, suppressed, and eliminated throughout the State of North Dakota. Plaintiff and members of the State Law Class, including those who resided in the State of North Dakota and purchased Conventional Eggs there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of North Dakota.

366. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under North Dakota Century Code §§ 51-08.1-01, *et seq*.

**COUNT 41: OREGON**
**VIOLATION OF THE OREGON ANTITRUST LAW,**
**OR. REV. STAT. §§ 646.725, *et seq.***
**(On Behalf of Class Members that Purchased Conventional Eggs in Oregon)**

367. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

368. Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Oregon; (2) Conventional Eggs prices in the State of Oregon were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals been deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected the State of Oregon commerce.

369. Defendants entered into an unlawful agreement in restraint of trade in violation of Oregon Revised Statutes §§ 646.725, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Oregon Revised Statutes §§ 646.725, *et seq*.

**COUNT 42: OREGON**
**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT, OR. REV. STAT. §§ 646.605, *et seq.***
**(On Behalf of Class Members that Purchased Conventional Eggs in Oregon)**

370. Plaintiff incorporates by reference the allegations in the preceding paragraphs,

excluding causes of action.

371. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Oregon Revised Statutes §§ 646.605, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**<u>COUNT 43: PUERTO RICO</u>**
**VIOLATION OF THE PUERTO RICO ANTITRUST ACT,**
**PR. LAWS ANN. TIT. 10, CH. 13, §§ 257, *et seq.***
**(On Behalf of Class Members that Purchased Conventional Eggs in Puerto Rico)**

372. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

373. Defendants' actions violated P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq.*, through their anticompetitive actions. Through their actions and actions of co-conspirators, Conventional Eggs prices in Puerto Rico were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and members of the State Law Class. Throughout the Class Period, price competition in the market for Conventional Eggs was restrained, suppressed, and eliminated throughout Puerto Rico. Plaintiff and members of the State Law Class, including those who resided in Puerto Rico and purchased Conventional Eggs there, paid supra-competitive, artificially inflated prices. During the Class Period, Defendants' illegal conduct substantially affected commerce in Puerto Rico.

374. Defendants entered into an unlawful agreement in restraint of trade in violation of P.R. Laws Ann. tit. 10, ch. 13, § 258. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under P.R. Laws Ann. tit. 10, ch. 13, §§ 258, *et seq*.

**COUNT 44: RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND ANTITRUST LAW,**
**R.I. GEN. LAWS §§ 6-36-7, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Rhode Island)**

375. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

376. Defendants' combination or conspiracy detrimentally affected the price competition in the State of Rhode Island for Conventional Eggs by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Conventional Eggs prices in the State of Rhode Island at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Rhode Island.

377. Defendants entered into an unlawful agreement in restraint of trade in violation of Rhode Island General Laws §§ 6-36-7, *et seq.* Accordingly, Plaintiff and members of the State Law Class seek all relief available under Rhode Island General Laws §§ 6-36-7, *et seq*.

**COUNT 45: RHODE ISLAND**
**VIOLATION OF THE RHODE ISLAND UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT, R.I. GEN. LAWS §§ 6-13.1-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Rhode Island)**

378. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

379. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Rhode Island General Laws § 6-13.1-1, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**COUNT 46: SOUTH DAKOTA**
**VIOLATION OF THE SOUTH DAKOTA ANTITRUST LAW, S.D. COD. LAWS §§ 37-1-3.1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in South Dakota)**

380. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

381. Through their actions and actions of co-conspirators, Conventional Eggs prices in the State of South Dakota were raised, fixed, maintained, and stabilized at artificially high levels, thereby injuring Plaintiff and the State Law Class. Throughout the Class Period, price competition in the market for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of South Dakota. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of South Dakota. Plaintiff and members of the State Law Class, including those who resided in the State of South Dakota and purchased Conventional Eggs there, paid supra-competitive, artificially inflated prices for their Conventional Eggs.

382. Defendants violated South Dakota Codified Laws §§ 37-1-3.1, *et seq.*, through their anticompetitive actions. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under South Dakota Codified Laws §§ 37-1-3.1, *et seq.*

**COUNT 47: SOUTH DAKOTA**
**VIOLATION OF THE SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT, S.D. COD. LAWS §§ 37-24-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in South Dakota)**

383. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

384. Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of South Dakota Codified Laws §§ 37-24-1, *et seq.*, and, accordingly, Plaintiff and members of the State Law Class seek all relief available under that statute.

**<u>COUNT 48: TENNESSEE</u>**
**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT,**
**TENN. CODE ANN. §§ 47-25-101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Tennessee)**

385. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

386. Defendants entered into an unlawful agreement in restraint of trade in violation of Tennessee Code Annotated §§ 47-25-101, *et seq.* Defendants' combination or conspiracy had the following effects: (1) price competition for the sale of Conventional Eggs, tangible goods, was restrained, suppressed, and eliminated throughout the State of Tennessee; (2) prices for Conventional Eggs, tangible goods, in the State of Tennessee were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Tennessee.

387. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Tennessee Code Annotated §§ 47-25-101 *et seq*.

**<u>COUNT 49: UTAH</u>**
**VIOLATION OF THE UTAH ANTITRUST ACT,**
**UTAH CODE ANN. §§ 76-10-3101, *et seq*.**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Utah)**

388. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

389. Defendants violated Utah Code Annotated §§ 76-10-3101, *et seq.* by entering into an unlawful agreement in restraint of trade in the State of Utah. Specifically, Defendants' combination or conspiracy detrimentally affected the price competition in the State of Utah for the Conventional Eggs market by restraining, suppressing, and eliminating competition. Furthermore, Defendants' unlawful conduct raised, fixed, maintained, and stabilized Conventional Eggs prices

in Utah at artificially high levels. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Utah.

390. Accordingly, Plaintiff and Members of the State Law Class seek all relief available under Utah Code Annotated §§ 76-10-3101, *et seq*.

**COUNT 50: VERMONT**
**VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,**
**9 V.S.A. §§ 2451, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Vermont)**

391. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

392. Defendants' combination or conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Vermont; (2) Conventional Eggs prices in the State of Vermont were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. Defendants entered into an unlawful agreement in restraint of trade in violation of Vermont Consumer Fraud Act, Vermont Statutes Annotated, Title 9 §§ 2453, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of Vermont.

393. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Vermont Consumer Fraud Act, Vermont Statutes Annotated, Title 9 §§ 2465, *et seq*.

**COUNT 51: WEST VIRGINIA**
**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,**
**W. VA. CODE §§ 47-18-1, *et seq.***
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in West Virginia)**

394. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

395. Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of West Virginia; (2) Conventional Eggs prices in the State of West Virginia were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. Defendants entered into an unlawful agreement in restraint of trade in violation of West Virginia Code §§ 47-18-1, *et seq*. During the Class Period, Defendants' illegal conduct substantially affected commerce in the State of West Virginia. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under West Virginia Code §§ 47-18-1, *et seq*.

**COUNT 52: WISCONSIN**
**VIOLATION OF THE WISCONSIN ANTITRUST ACT, WIS. STAT. § 133.03**
**(On Behalf of State Law Class Members that Purchased Conventional Eggs in Wisconsin)**

396. Plaintiff incorporates by reference the allegations in the preceding paragraphs, excluding causes of action.

397. Defendants entered into an unlawful contract and conspiracy in restraint of trade in violation of Wisconsin Statute § 133.03(1). Defendants' conspiracy had the following effects: (1) price competition for Conventional Eggs was restrained, suppressed, and eliminated throughout the State of Wisconsin; (2) Conventional Eggs prices in the State of Wisconsin were raised, fixed, maintained, and stabilized at artificially high levels; and (3) individuals were deprived of free and open competition. Accordingly, Plaintiff and members of the State Law Class seek all forms of relief available under Wisconsin Statute § 133.03.

## XII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment as follows:

1) The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as the Class

Representative and his counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Classes;

2) Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

3) The unlawful conduct, conspiracy or combination alleged herein be adjudged and decreed a *per se* violation of Section 1 of the Sherman Act, and a violation of each of the state law statutes alleged herein;

4) Awarding Plaintiff and the relevant Class Members compensatory damages under the state statutes in an amount to be proven at trial, multiple damages according to law against Defendants, jointly and severally;

5) Awarding Plaintiff and the relevant Class Members punitive, exemplary, statutory, and full consideration damages under the aforementioned state laws;

6) Ordering Defendants to disgorge their profits earned as a result of their wrongful conduct and ordering them to make restitution to Plaintiff and Class Members;

7) Plaintiff and the Class Members be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8) Plaintiff and the Class Members recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9) Granting Plaintiff and the Class Members such other and further relief as the Court deems just and proper.

## XIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: January 22, 2026

By: */s/ Daniel L. Warshaw*

Daniel L. Warshaw (*Pro Hac Vice Forthcoming*)
Bobby Pouya (*Pro Hac Vice Forthcoming*)
Adrian Buonanoce (*Pro Hac Vice Forthcoming*)
Naveed Abaie (*Pro Hac Vice Forthcoming*)
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone: (818) 788-8300
dwarshaw@pwfirm.com
bpouya@pwfirm.com
abuonanoce@pwfirm.com
nabaie@pwfirm.com

Brian S. Pafundi (*Pro Hac Vice Forthcoming*)
**PEARSON WARSHAW, LLP**
328 Barry Ave. South, Suite 200
Wayzata, MN 55391
Telephone: (612) 389-0600
bpafundi@pwfirm.com
Douglas A. Millen (*Pro Hac Vice Forthcoming)*
Robert J. Wozniak (*Pro Hac Vice Forthcoming)*
Samantha M. Gupta (*Pro Hac Vice Forthcoming)*
**FREED KANNER LONDON**
**& MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
dmillen@fklmlaw.com
rwozniak@fklmlaw.com
sgupta@fklmlaw.com

Kimberly A. Justice (*Pro Hac Vice Forthcoming*)
**FREED KANNER LONDON**
**& MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (484) 243-6335
kjustice@fklmlaw.com

*Attorneys for Plaintiff*